Nick B. Trapalis and Margaret Trapalis, d/b/a Picky Nicky Cafe, appellees, v. Ben J. Gershun and Selma Gershun, appellants.

No. 52004.

OCTOBER 18, 1966.

Kenneth Sacks, of Council Bluffs, and Robert Silverman, of Omaha, Nebraska, both for appellants.

Smith, Peterson, Beckman & Willson and H. W. Walter, all of Council Bluffs, for appellees.

SNELL, J.—This is an action at law by a tenant against his landlord for alleged premature and unjustified termination of

a five-year lease. At the time of trial Margaret Trapalis, one of the original plaintiffs, was deceased. Nick B. Trapalis continued as plaintiff. Ben J. Gershun was deceased and his executrix substituted as defendant. The case has been twice tried with a verdict for plaintiff each time. The first verdict was set aside by the trial court and a new trial ordered. From the judgment on the verdict in the second trial defendants have appealed.

Throughout the time material to this case defendants were the owners of a lot and building commonly known as 419 West Broadway in Council Bluffs. At the time defendants acquired title plaintiff was a tenant and was operating a restaurant business therein. He continued under successive leases. The latest lease and the one under which this action arose was in writing and was for five years from December 1, 1958, to November 30, 1963. The rent to be paid is not in issue here. The part of the property so demised included the first floor and basement only and was to be used as a restaurant.

Among many provisions the lease provided:

"That the Lessees are now in occupancy of said described premises, and accept the building in its present condition. It is further agreed that the Lessors will maintain the exterior of the roof, structural walls, and sidewalks in good repair. * * * It is further provided, however, that the Lessors shall not be liable to the Lessees for any damage by reason of the condition of the roof, structural walls or sidewalks, unless the Lessees shall have first given the Lessors written notice of the condition and the Lessors shall then have had a reasonable time within which to make the repairs. The Lessors shall not be responsible to the Lessees for damage to Lessees' property caused by flood or any other accident beyond the Lessors' control. * * *

"The Lessors shall not be liable to the Lessees for any damages that may be caused by * * * said building being out of repair, except as hereinbefore provided, * * * nor for damages resulting from any cause beyond their control. * * *."

On June 26, 1961, defendants served on plaintiff a notice to quit, reading as follows:

"Notice To Quit

"To: Nick B. Trapalis

"You and each of you are hereby notified that the undersigned demands that you vacate and surrender to said undersigned no later than July 10th, 1961, the possession of the premises now occupied by you and described as the building known as the Picky Nicky Cafe, 419 West Broadway, Council Bluffs, Iowa, for the reason that said building has been condemned and rendered unsafe for human occupancy by the building inspector of the City of Council Bluffs, Iowa.

"Said building inspector has ordered these premises vacated by July 10th, 1961, and demolition commenced within ten (10) days thereafter. You are also notified that under the terms of said lease this lease is hereby cancelled and stands null and void and of no consequence whatsoever due to the action of the aforesaid building inspector."

Plaintiff offered and the court admitted testimony that he attempted without success to find another location for his business within the time permitted; that he closed his business and sold his fixtures at auction and suffered substantial loss.

The building involved was in the middle of three old buildings located at 417, 419 and 421 West Broadway. In the spring of 1961 the building inspector for the City of Council Bluffs examined the three buildings. The investigation was prompted by the collapse of a parapet of an adjoining building. He testified that he found the buildings badly deteriorated. We quote from the record:

"419 West Broadway was a three-story building with native brick walls laid with lime mortar. It had a clay brick foundation and wooden floors. The buildings were over a hundred years old and of a standard construction for that period.

"The principal faults he found in examining 419 West Broadway were the deterioration of the foundation, the foundation walls and the bearings for the floor joists. * * * He sent a notice * * * to Ben Gershun informing him that the building at 419 West Broadway was unsafe to occupy and condemned, and notifying him to make arrangements within 15 days to cor-

rect or remove the property. * * *

"Identical notices were sent to the owners of 417, 419 and 421 West Broadway. There was a party wall between 419 and 417, but the wall was in a better condition on the east side than the west side.

"The third floor of the Gershun building evidenced the most serious condition. The condition got progressively worse as you went towards the top of the building. The primary serious faults with the Gershun building were structural. The bearing walls were deteriorated releasing support for the joists. The joists themselves were not unsafe but the walls were not giving them support. The Sternhill building located at 417 West Broadway was rehabilitated and remodeled over his objection and the demolition order was withdrawn and the tenants moved back in. After the corner building was rebuilt the tenant moved in again."

An architectural engineer accompanied the building inspector and examined the buildings. He testified for defendants. We quote from the record:

"He found considerable loss of mortar in joints and considerable sloughing off of some bricks. * * * In the basement of the Gershun building he found that many of the wall bricks had started to deteriorate and disintegrate. This deterioration had been caused by age and moisture resulting from water seeping through structural cracks in the walls. * * * He knew of no way that the deterioration could be prevented or cured except by taking the bricks out and replacing them. * * *

"In his opinion new footings would have to be put in and the whole foundation would have to be rebuilt if the building was ever to be fixed up or used. * * * It would be cheaper and probably take less time to tear the building down and build a new building. * * *

"If the upper stories had been removed it would reduce the load on foundation footings. The less the load the smaller foundations. The exterior walls could be protected by plastering. That water was coming in on the third floor and below that, the same evidence through structural wall cracks, which accounted for water in the building, also considerable leakage in the win-

dows, removing the upper two stories and jacking possibly on wooden strainers, would take some of the load off the bearing walls would extend the life of the building."

Another architect who examined the building for defendants testified. We quote from the record:

"He toured the building from top to bottom and found the basement to be the most revealing part because the structure was open there. He found the brick walls to be in a 'very, very bad state of decay, both the brick itself and the mortar joints which held it in.' * * *

"He knew of nothing that could be done to prevent this deterioration once the moisture was absorbed and nothing could have been done within the preceding five years which would have prevented the deterioration. * * *

"In examining the upper floors he found evidence that the structural wall had failed. In his opinion the only possible method of restoration would have been to take down the walls, a piece at a time in five-foot sections and replace the wall section by section—* * *.

"He understood that all three buildings had been condemned and that Gershun owned the center building. He assumed that the other buildings were to be taken down and that he was to give an opinion as to whether the Gershun building could be restored.

"He stated the top floor was unrepairable, that at some time water had leaked through the roof. * * *."

Defendants filed and the court overruled motions for directed verdict, motion for judgment notwithstanding the verdict and motion for new trial.

I.  Defendants argue that the court erred in overruling defendants' motions because the condemnation and demolition order by the city permitted defendants to terminate the lease. We do not agree that such right appeared as a matter of law.

■  When a lease provides that structural walls be maintained in good repair we cannot say as a matter of law that there is no breach when they deteriorate to the point of danger.

■  Factually it should be noted that the notice by the building inspector to defendants was to "correct or remove."

Identical notices were sent to the three owners of adjacent property. The building at 417 West Broadway was rehabilitated and the demolition order withdrawn. The primary serious faults with defendants' building were structural due to deterioration of bearing walls. There was ample evidence from defendants' witnesses that rehabilitation of the building would be financially inadvisable but there was no testimony that it would be impossible. In their brief and argument appellants admit that they could have rebuilt after demolition or engaged in the slow and difficult rehabilitation as described by their architect. They say the issue is whether under the lease their failure to do so was a breach.

As quoted, supra, the lease obligated the lessors to maintain the structural walls. Defendants' own witnesses testified that the primary faults were structural and the bearing walls were deteriorated and not giving support.

In Instruction No. 9 the court told the jury:

"You are further instructed that where a lessor leases a building for a particular purpose, and covenants to repair it, it is his duty to put it in such a state of repair as the business requires under the terms of the lease. Good repair and good condition at all times is the fair intent of the agreement."

Instruction No. 10, not argued as error on appeal, told the jury:

"You are further instructed that in addition to the express terms of a written lease, there is in every lease a covenant implied by law that the landlord will provide the tenant with quiet enjoyment and peaceable possession of the premises during the term of the lease.

"In this connection you are instructed that if the plaintiff was evicted for any reason over which the defendant had no control or could not prevent, then in that event there would be no breach of this implied covenant. But if, on the other hand, the defendant could have prevented the eviction of the plaintiff and the termination of said lease, he would be liable to plaintiff in the event you find he was damaged."

Defendants cite and rely on Healey v. Tyler, 150 Iowa 169, 129 N.W. 802, wherein it is said that a lessor is under no obligation to make repairs unless such obligation is imposed by the

terms of the lease. In that case there was flood damage. Other cases cited by defendants involved destruction by fire or catastrophe over which neither lessor nor lessee had any control and the question was the contractual obligation of the parties. The cases are not factually comparable to the case at bar. Here there was no sudden catastrophe. There was a deterioration of structural walls that under the lease defendants were obligated to maintain.

In David v. Ryan, 47 Iowa 642, there was an agreement to keep the premises "in a good state of repair." The building was destroyed by fire and it was held the agreement created an obligation to restore the burned premises. Loc. cit. 645. A city ordinance establishing fire limits made it unlawful to erect the same kind of building that was destroyed. It was said:

"The ordinance does not render the performance of the covenant impossible. It simply makes it more burdensome and expensive. The fact that the performance of a contract is rendered more burdensome and expensive, by a law enacted after it is entered into, has never been held to exonerate a party from its performance." Loc. cit. 645.

That case involved a general agreement to maintain in a good state of repair. No such agreement is now before us but the lease here involved contains an agreement to maintain structural walls and defendants' own witnesses found that the basic trouble arose therefrom.

We find no error in submitting the issue of contractual breach to the jury.

Defendants argue that Instruction No. 9, quoted supra, was not factually applicable. We do not agree. Plaintiff was put out of business. The issue was whether under the fair intent of the lease agreement there was a breach. Did the condition of the building violate defendants' agreement to maintain structural walls? The instruction was taken from Piper v. Fletcher, 115 Iowa 263, 266, 88 N.W. 380, and was applicable to the issues tendered.

In In re Estate of Klepper, 244 Iowa 521, 528, 57 N.W.2d 565, we reaffirmed the rule that where a lease agreement is susceptible to two meanings there is a fact question for the jury.

II. Ben J. Gershun, originally the first-named defendant,

was dead at the time of trial. Under the dead man statute oral testimony of conversations or transactions with him was not admitted. What the testimony might otherwise have been we do not know.

III. Defendants tendered as an issue that it was impossible to repair the premises in conformity with the provisions of the lease. The court submitted this as an affirmative defense and told the jury that if proven "by a preponderance or greater weight of the evidence, your verdict will be for the defendants." The court defined impossibility as follows:

"Impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved."

The instructions were favorable to defendants. Defendants have no basis for complaint.

IV. Defendants contend there was insufficient evidence of plaintiff's damages to submit to the jury.

Plaintiff claimed damage because he was required to dispose of his merchandise, stock and fixtures and for loss of profits during the unexpired period of his lease. There were no exceptions to the instruction on damages. See rule 196, Rules of Civil Procedure.

Defendants claim there was no reasonable basis for determination of plaintiff's damage. There was evidence from which the jury could find that the time available to plaintiff for the moving or liquidation of his business was short and that he suffered loss when forced to sell before the expiration date of his lease.

Defendants offered evidence that would minimize or refute this testimony.

Plaintiff testified as to his profits during preceding years. Through reference to plaintiff's income tax reports defendants challenged the accuracy of plaintiff's claims.

The jury's verdict was within the evidence. It is not for us to pass on the weight and credit of the testimony. That is what juries are for. While it appears that the jury was generous in its award (the second jury awarded more than the first) two separate juries have awarded substantial amounts to plaintiff. We are reluctant to interfere under such circumstances.

■ V. Defendants offered testimony that repair and rehabilitation of the building would not be financially advisable. This testimony was given by architects employed by defendants to advise relative to the building. One testified that it would be cheaper to tear down the old building and build a new one. The issues of the good faith of defendants, their reasons for not repairing and the financial loss they faced were in the case.

Plaintiff called as his witness the accountant who prepared defendants' income tax returns. Over defendants' objections he testified that when the building was torn down in 1961 the undepreciated cost in the sum of $17,688.76 was charged off as a loss. He was not permitted to testify as to what, if any, tax advantage followed this charge-off. He did not testify as to defendants' wealth or income.

Defendants argue and we agree that it is prejudicial for a plaintiff to improperly introduce the question of wealth into the trial of such a case.

We do not agree that in this case evidence was improperly received. There was no attempt to show the extent of defendants' possessions or income. The fact that defendants might and did offset or minimize any loss resulting from tearing down their building was pertinent to testimony defendants offered that it would be cheaper "to tear the building down and build a new building" than repair the old. Instruction No. 6, quoted supra in Division III, to which there were no exceptions, recognized impracticability, expense and injury as material in determining impossibility. If expenses and injury are to be considered we find no error in the admission of testimony showing that financial loss might be offset or minimized.

VI. Defendants' brief presents no argument based on the provision of the lease that lessees "accept the building in its present condition" and no issue relative thereto is before us.

VII. Further elaboration is unnecessary. We have examined the entire record and find no errors justifying our interference with the verdict of the jury or the judgment thereon.

The case is—Affirmed.

All JUSTICES concur.