Daniel O. BECKER and Donna L.
Becker, Appellees,

v.

D & E DISTRIBUTING COMPANY and
Ronald D. Keilholtz, Appellants.

No. 2–57313.

Supreme Court of Iowa.

Nov. 17, 1976.

Robert Tilden and Stephen J. Holtman of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellants.

Francis J. Pruss, Cedar Rapids, for appellees.

Heard by MOORE, C. J., and RAWLINGS, REES, REYNOLDSON and McCORMICK, JJ.

REYNOLDSON, Justice.

In this litigation arising out of a two-vehicle collision the jury awarded plaintiff Daniel O. Becker damages for personal injuries. His wife, plaintiff Donna L. Becker, obtained judgment for loss of consortium. For purposes of this appeal defendants concede liability but challenge certain trial court rulings relating to expert testimony and submission of issues to the jury.

Following the collision on November 13, 1969 Becker was confined to Mercy Hospital in Cedar Rapids where he was treated by Dr. W. John Robb, an orthopedic surgeon. Dr. Robb diagnosed his injuries as a comminuted fracture of the left knee cap, a rib fracture, and a sprain of the lumbar spine. Following surgery to remove the knee cap Becker was discharged from the hospital November 25, 1969. He was readmitted December 27, 1969 for manipulation of the left leg under anesthetic to relieve adhesions and was again discharged December 30, 1969. He was not released to return to work until March 16, 1970.

Four months after he returned to work Becker was again seen by Dr. Robb for a "foot problem" which in the opinion of the doctor was unrelated to the collision.

March 22, 1974, three days before trial, Dr. Marvin Douglas Marr, a podiatrist, first examined and treated Becker for pain he was experiencing with his feet. In Dr. Marr's opinion, the foot pains in part could be related to his leg injury incurred in the collision.

Dr. G. Douglas Valentine, a chiropractor, first saw Becker on December 6, 1973 and thereafter treated his spine. He expressed the opinion his patient had a permanent back injury resulting from trauma sustained in the collision.

The issues raised here relate to the testimony of these doctors. Defendants assert trial court erred 1) in overruling defendants' motion to withdraw from consideration by the jury any issue relating to a claimed injury to Becker's feet resulting from the collision and 2) in permitting a

chiropractor to express an opinion there was a causal connection between an alleged permanent back disability and the collision in light of "his lack of factual data, qualifications, and the possibility of intervening causes."

## I. *Refusal to withdraw foot injury issue from jury consideration.*

After evidence was closed defendants moved to withdraw from consideration of the jury certain claimed injuries to various portions of Becker's body, including his feet, because there was no "competent credible evidence in the record to support the submission of any claim of permanent injury to any of those portions of the body." Defendants further argued Dr. Marr was unable to allocate "what part of the foot problem * * * he could attribute to the accident and what was the congenital problem and what was caused by the fracture of the foot bone."

Trial court overruled this motion as it related to Becker's feet.

Although substantial evidence indicated there was a hereditary or congenital weakness in Becker's feet, this condition had caused him no difficulty or pain before the collision. Dr. Robb, who took no x-rays, described Becker as having "flat feet". Dr. Marr, the podiatrist, on the basis of examinations and x-rays, diagnosed Becker's pre-injury condition as a non-locking talonavicular joint.

After the collision when he returned to his employment, which involved heavy lifting, Becker's feet began to pain him. In July 1970 he consulted Dr. Robb who diagnosed the condition as "arch strain" unrelated to the collision. He prescribed shoe inserts.

However, Dr. Marr opined this foot distress "could be" the result of the weakness and atrophy of the injured and long unused left leg muscles which caused Becker to carry his weight on his feet in an unusual manner, affecting his normal gait. Excessive rotation of the talonavicular joint which did not completely lock strained the plantar facie (a bundle of muscles in the bottom of the foot) producing an inflammation. This was greater on the left foot than on the right.

In 1973 Becker dropped a weight on his left foot, fracturing the second and third metatarsal bones.

Early in his testimony Dr. Marr stated the pre-existing condition, the injuries sustained in the collision, and the fractures several years later could all contribute to Becker's present foot problem. He was unable to state what percent of Becker's disability was attributable to each factor. Later in his cross-examination, when his attention was focused specifically on the subsequent fractures, Dr. Marr testified there was no connection between the fractures and Becker's present condition:

"Q. That's fine, but that fracture also could be a cause of this man's present condition? A. I doubt it.

Q. In no way? A. None that I can find.

\* \* \* \* \* \*

Q. Okay. When you say that 60 pounds of metal dropped on the foot, you don't think it would affect the particular foot in any way at all? A. No. He elicits absolutely no tenderness in that particular area."

Defendants' claim of error in submitting the foot problems to the jury has two grounds. They first assert the evidence and expert testimony disclosed only a possibility of causation, not a probability. Second, they contend plaintiffs' expert could not approximate the percent of damages, if any, caused by the collision as opposed to other factors, thus permitting the jury to speculate.

In examining these grounds we apply several well-established principles.

■ In determining whether a jury issue is engendered trial court views the evidence in the light most favorable to the party against whom the motion was made regardless of whether such evidence is contradicted. Every legitimate inference which may reasonably be deduced therefrom must be

carried to the aid of the evidence. If reasonable minds can differ on the issue it is for the jury. *Schiltz v. Cullen-Schiltz & Assoc., Inc.,* 228 N.W.2d 10, 17 (Iowa 1975); *West v. Broderick & Bascom Rope Company,* 197 N.W.2d 202, 211 (Iowa 1972).

■ The weight and credibility of testimony are matters for the jury. *Trapalis v. Gershun,* 259 Iowa 775, 783, 145 N.W.2d 591, 596 (1966). This rule applies even though there are contradictions or inconsistencies in the testimony of a particular witness. *Rehmann v. Balduchi,* 169 N.W.2d 894, 896 (Iowa 1969); *Houlahan v. Brockmeier,* 258 Iowa 1197, 1201, 141 N.W.2d 545, 548, supplemented, 258 Iowa 1205, 141 N.W.2d 924 (1966); *Youngwirth v. State Farm Mutual Auto. Ins. Co.,* 258 Iowa 974, 981, 140 N.W.2d 881, 885–886 (1966); see *Kaltenheuser v. Sesker,* 255 Iowa 110, 117, 121 N.W.2d 672, 676 (1963).

Turning to defendants' assertion the evidence indicated only a possibility of causal connection between the collision and the disability to Becker's feet, we note additional rules.

■ An expert may express his opinion either as to the "possibility, probability, or actuality" of causation. *Winter v. Honeggers' & Co.,* 215 N.W.2d 316, 321 (Iowa 1974).

■ Evidence indicating a probability or likelihood of the causal connection is necessary to generate a jury issue. *Bradshaw v. Iowa Methodist Hospital,* 251 Iowa 375, 379–380, 101 N.W.2d 167, 170 (1960). However, this "probability" may be inferred by combining an expert's "possibility" testimony with nonexpert testimony that the described condition of which complaint is made did not exist before occurrence of those facts alleged to be the cause thereof. *Winter,* supra, 215 N.W.2d at 323; *Chenoweth v. Flynn,* 251 Iowa 11, 17–18, 99 N.W.2d 310, 314 (1959); *Rose v. John Deere Ottumwa Works,* 247 Iowa 900, 910, 76 N.W.2d 756, 761–762 (1956); see McCormick, Opinion Evidence in Iowa, 19 Drake L.Rev. 245, 260 (1970).

■ It was this failure to show there was no prior disability which caused this court to reverse a plaintiff's judgment in *Bradshaw,* supra, a decision relied on by these defendants. Bradshaw was already suffering from back trouble when he fell in the defendant hospital and allegedly incurred further spinal injury. In *McClenahan v. Des Moines Transit Co.,* 257 Iowa 293, 300–301, 132 N.W.2d 471, 476 (1965) we pointed out these circumstances distinguished *Bradshaw,* supra, from *Chenoweth* and *Rose,* supra, and controlled the result.

Defendants equate Becker's pre-collision foot defects with Bradshaw's pre-existing back condition, reasoning in both cases the issue of the respective injuries should not have been submitted to the jury. But Becker's prior foot condition was asymptomatic before the collision and consequent leg injury. The evidence indicates it was not disabling in any way. The situation is therefore analogous to plaintiff's prior osteoarthritis in *Rose,* supra. This is simply an application of the familiar principle that a tort-feasor takes the person he injures as he finds him. *McBroom v. State,* 226 N.W.2d 41, 45 (Iowa 1975) and citations.

The *Rose-Chenoweth* two-pronged test for submission of such an issue to the jury, most recently articulated in *Winter,* supra, 215 N.W.2d at 323, was met in this case.

On a related sub-issue, defendants assert the jury should not have been permitted to speculate on the extent of Becker's disability resulting from his foot pain when Dr. Marr was unable to apportion that disability between the collision and other contributing causes.

■ Our general rule limits a defendant's liability to compensation for injuries caused by his own acts of negligence, and not for injury, suffering or impaired health due to other causes. *Waterloo Sav. Bank v. Waterloo, Cedar Falls & N.R.R.,* 244 Iowa 1364, 1375, 60 N.W.2d 572, 578 (1953). This principle does however have exceptions. For example, we have held tort-feasors whose independent acts contribute to a total injury may be jointly and severally liable for the full amount of indivisible dam-

ages. *Treanor v. B.P.E. Leasing, Inc.,* 158 N.W.2d 4, 6 (Iowa 1968); *Ruud v. Grimm,* 252 Iowa 1266, 1272, 110 N.W.2d 321, 324 (1961).

■ It is also apparent mere existence of a prior non-disabling, asymptomatic, latent condition is not a defense. A tort-feasor whose act, superimposed upon such condition, results in an injury may be liable in damages for the full disability. In these cases the injury, and not the dormant condition, is deemed to be the proximate cause of the pain and disability. See *Woode v. Kabela,* 256 Iowa 622, 632, 128 N.W.2d 241, 247 (1964); *Hackley v. Robinson,* 219 N.W. 398, 398–399 (Iowa 1928); *Hanson v. Dickinson,* 188 Iowa 728, 732, 176 N.W. 823, 824–825 (1920); *Bennett v. Messick,* 76 Wash.2d 474, 478, 457 P.2d 609, 612 (1969); 22 Am.Jur.2d Damages § 123, pp. 175–176; Annot., Cause of Musculoskeletal Condition, 2 A.L.R.3d 290, 316–319 (1965); cf. *Gosek v. Garmer and Stiles Co.,* 158 N.W.2d 731, 737 (Iowa 1968); *Nicks v. Davenport Produce Co.,* 254 Iowa 130, 135, 115 N.W.2d 812, 815 (1962).

In *Newbury v. Vogel,* 151 Colo. 520, 379 P.2d 811 (1963) two of the medical experts testified a portion of plaintiff's pain and permanent limitation of motion was due to the accident and a portion was due to the pre-existing arthritis, but they both stated they could not apportion between the two. The Colorado court held 151 Colo. at 524, 379 P.2d at 813:

> "We find the law to be that where a pre-existing diseased condition exists, and where after trauma aggravating the condition disability and pain result, and no apportionment of the disability between that caused by the pre-existing condition and that caused by the trauma can be made, in such case, even though a portion of the present and future disability is attributable to the pre-existing condition, the defendant, whose act of negligence was the cause of the trauma, is responsible for the entire damage."

See also *McDonald v. United Airlines, Inc.,* 365 F.2d 593, 594 (10 Cir. 1966); *Hylton v. Wade,* 29 Colo.App. 98, 99–100, 478 P.2d 690, 691 (1970); *Winn-Dixie Stores, Inc. v. Nafe,* 222 So.2d 765, 766 (Fla.Dist.Ct.App. 1969); *Wise v. Carter,* 119 So.2d 40, 43 (Fla.Dist.Ct.App.1960); *Kawamoto v. Yasutake,* 49 Hawaii 42, 50, 410 P.2d 976, 981 (1966); *Blaine v. Byers,* 91 Idaho 665, 672, 673, 429 P.2d 397, 405 (1967).

■ In the case *sub judice* there is proof Becker had no disability before the collision. He did have a latent foot problem which Dr. Marr found "contributed" to his post-collision disability. It is not clear whether this latent condition eventually would have caused some partial disability even without the collision. Assuming for the purposes of our consideration such result might have ensued, we nonetheless apply the *Vogel* rule, supra, in holding impossibility of allocation should not foreclose plaintiff's right of action against an injury-causing tort-feasor.

■ Finally, we consider the effect of Becker's subsequent foot injury in 1973. The general rule holds a defendant cannot be held liable for injuries sustained after his negligence. *Bruckman v. Pena,* 29 Colo. App. 357, 360, 487 P.2d 566, 568 (1971); 22 Am.Jur.2d Damages § 115, pp. 167–168; see *Jurney v. Lubeznik,* 72 Ill.App.2d 117, 132, 218 N.E.2d 799, 806 (1966). Exceptions arise in the case of independently acting tort-feasors joined as defendant where damages cannot be apportioned, *Treanor,* supra, *Ruud,* supra, and where the subsequent injury-producing act is a sequela of the first, *Cross v. Hermanson Bros.,* 235 Iowa 739, 741–742, 16 N.W.2d 616, 617 (1944); see *Cardamon v. Iowa Lutheran Hospital,* 256 Iowa 506, 514, 128 N.W.2d 226, 233–234 (1964); *Phillips v. Werndorff,* 215 Iowa 521, 522, 243 N.W. 525, 526 (1932); 22 Am.Jur.2d Damages § 115, pp. 167–168; Annot., Proximate Cause: Liability of Tort-feasor for Injured Person's Subsequent Injury or Reinjury, 31 A.L.R.3d 1000 (1970).

■ If the evidence were uncontroverted that Becker's present foot condition resulted in whole or in part from the 1973 incident, the general rule and none of the exceptions would apply because Becker's

subsequent act in dropping a weight on his foot clearly would have no causal connection with the alleged negligence of defendants.

But here, as we have already indicated, the evidence was not uncontroverted. Dr. Marr twice denied the weight-dropping accident had any connection with Becker's present foot condition. Following the authorities set out above and leaving for the jury the weight and credibility of the testimony, including contradictions and inconsistencies in the testimony of a particular witness, we hold the issue was properly submitted. Under the instructions submitted the jury could have found the 1973 injury had no relationship to Becker's present complaints.

Trial court did not err in overruling defendants' motion to withdraw from the consideration of the jury any issue relating to the claimed injury to Becker's feet resulting from the collision.

II. *Permitting the chiropractor to express an opinion.*

There is evidence in the record Becker had no back problems before the November 1969 collision.

Dr. Robb, the orthopedic surgeon who was Becker's initial treating doctor, diagnosed the back injury incurred in the collision as a lumbar sprain. This doctor also testified x-rays taken at that time disclosed a mild amount of degenerative arthritis in the lumbosacral area. A new set of x-rays was taken during an examination in April 1972 because Becker was still complaining of low back pain. The doctor felt this "was a continuation of his original problem." As the result of another examination in March of 1974 Dr. Robb expressed the opinion some of Becker's back symptoms were due to the November 1969 injury. Dr. Robb testified upon his examination in chief he did not regard the back problem as a permanent impairment; he expected it to exist "probably several years when he's involved in heavy work."

Plaintiffs called as a witness Dr. Valentine, a licensed chiropractor, who first ex-amined Becker on December 6, 1973 and thereafter treated him about 20 times for his back problem.

Dr. Valentine received two years of premedical training at Colorado State University. He completed the four-year course of chiropractic education at Palmer College of Chiropractic in Davenport. Upon graduation he headed a research project, taught at the college and completed his Ph.D. degree in 1968. He was graduated magna cum laude as class valedictorian. He had attended about 34 postgraduate seminars involving x-rays and technique studies.

Dr. Valentine testified Becker had sustained moderate to severe lumbosacral strain. X-rays taken by him disclosed a sublaxation or malalignment of the fifth lumbar vertebra. This condition created a wedging effect on the intervertebral disc and a nerve root compression.

This doctor was permitted to testify Becker sustained "approximately a ten percent permanent partial disability" as the result of the collision injury to his back, over the following objection:

"* * * no proper foundation laid for the question; nor has the witness been qualified because of the remoteness in time or a tie-up between the particular injury and the remoteness in examination; also for the further reason that it is based on subjective symptoms only. For the further reason there is a lack of foundation because there is not shown any other effect or trauma or lack thereof during the period or interval from the time of the accident until the time of examination by this doctor."

After plaintiffs rested their case, defendants recalled Dr. Robb and examined him as their witness concerning Dr. Valentine's x-ray negatives. Dr. Robb criticized these exhibits as to quality and the manner in which the patient was positioned. He could find no spinal abnormalities in them. For the benefit of the jury, he compared these x-rays with certain x-rays taken under his direction.

Dr. Robb then directly contradicted his earlier testimony by stating he would ex-

pect all the symptoms and problems resulting from the sprain he diagnosed in November of 1969 to have disappeared in three to six months thereafter, and could not connect Becker's present back pain with the injury incurred in the collision.

Defendants argue "trial court should have exercised its considerable discretion in regulating the opinion permitted by refusing to permit one with such questionable credentials to testify concerning causation when the foundation for any such testimony was wholly lacking."

 As defendants concede, admission of opinion evidence rests largely within trial court's discretion. *Miller v. International Harvester,* 246 N.W.2d 298, 302 (Iowa 1976); *Ganrud v. Smith,* 206 N.W.2d 311, 314–315 (Iowa 1973); *Tiemeyer v. McIntosh,* 176 N.W.2d 819, 824 (Iowa 1970). We will not interfere absent manifest abuse. *State v. Ogg,* 243 N.W.2d 620, 621-622 (Iowa 1976). In essence, defendants urge us to hold trial court abused its discretion in permitting the jury to consider a chiropractor's opinion relating to a spinal injury when that opinion clashed with the opinion of an orthopedic surgeon.

The practice of chiropractic is recognized and licensed in Iowa. Chapters 147, 151, The Code. Over twenty years ago this court held chiropractic to be a restricted form of the practice of medicine and a chiropractor to be qualified to interpret x-rays and express opinions within the bounds of that special field. *Lowman v. Kuecker,* 246 Iowa 1227, 1229–1230, 71 N.W.2d 586, 588 (1955). This is the prevailing view. *Andrade v. Correia,* 358 Mass. 786, 788, 267 N.E.2d 503, 504 (1971); *Line v. Nourie,* 298 Minn. 269, 276, 215 N.W.2d 52, 56 (1974); *Green v. Rosenow,* 63 Wis.2d 463, 467–474, 217 N.W.2d 388, 389–393 (1974); Annot., Expert Witness-Chiropractor, 52 A.L.R.2d 1384, 1385 (1957).

We find little authority to hold as a matter of law Dr. Valentine was unqualified. In our view, trial court did not abuse its discretion in permitting him to testify. There was no error in overruling the objection urged.

The case is therefore affirmed.

AFFIRMED.