**Dena SLEETH, Appellant,**

v.

**Tony Eugene LOUVAR and Doug Louvar, Appellees.**

No. 01–1315.

Supreme Court of Iowa.

April 2, 2003.

Martin A. Diaz, Iowa City, for appellant.

Matthew J. Nagle and Amy L. Reasner of Lynch Dallas, P.C., Cedar Rapids, for appellees.

LARSON, Justice.

We granted plaintiff Dena Sleeth's application for further review of a court of appeals decision regarding submission of an "aggravation" instruction in her personal-injury action. The plaintiff claims the district court's decision to give an aggravation instruction due to her preexisting arthritis conflicts with our decision in *Waits v. United Fire & Casualty Co.*, 572 N.W.2d 565 (Iowa 1997), and earlier cases. We vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for a new trial.

## I. *Facts and Prior Proceedings.*

Dena Sleeth was injured on April 1, 1998, when the defendant, Tony Louvar, ran a stop sign and hit her vehicle. Louvar admits his negligence. Sleeth had pain in her knees immediately after the accident and went to St. Luke's Hospital in Cedar Rapids for an examination. X-rays of her knees did not disclose any abnormalities.

Pain from her injury persisted, and on June 10, 1998, her physician referred her to an orthopedic surgeon, Dr. John Turner. Surgery on her left knee was performed on October 7, 1998. During surgery, the doctor found degenerative arthritis in Sleeth's left knee, and he believed this was present prior to the accident. At the time of the accident, Sleeth was thirty-one years old. She testified that she had no pain in her knees prior to the accident, but she does admit that her knees have "popped" since childhood.

## II. *The "Aggravation" and "Eggshell" Concepts.*

In *Waits*, as in the present case, the court instructed the jury on preexisting conditions under both the "eggshell" and "aggravation" concepts. We said:

To clarify the scope of the instructions involved here, we start with the general rule that a defendant is liable only for injuries caused by the defendant's fault, and not for pain or disability resulting from other causes. Thus, if a plaintiff had a prior back injury that caused pain and a ten percent disability *before* the injury inflicted by the defendant occurred, the defendant would not be responsible for the disability and pain that predated the current injury, but only for

any *additional* pain and disability caused by the current injury. Under these circumstances, an aggravation instruction is appropriately submitted to the jury.

The eggshell plaintiff rule is an *exception* to the general rule. This exception applies only when the pain or disability arguably caused by another condition arises *after* the injury caused by the defendant's fault has lighted up or exacerbated the prior condition. The law on this point was clearly stated in *Becker* [*v. D & E Distributing Co.*, 247 N.W.2d 727 (Iowa 1976)]:

> It is also apparent mere existence of a prior nondisabling, asymptomatic, latent condition is not a defense. A tort-feasor whose act, superimposed upon such condition, results in an injury may be liable in damages for the full disability. In these cases the injury, and not the dormant condition, is deemed to be the proximate cause of the pain and disability.

*Waits*, 572 N.W.2d at 577 (citations omitted) (quoting *Becker*, 247 N.W.2d at 731).

Sleeth's orthopedic doctor testified that the accident would have "aggravated her preexisting condition of osteoarthritis." The defendant has seized on this language as proof that the aggravation instruction was properly given. The plaintiff responds that "aggravation," as used by the doctor, was not used in its legal sense but in the sense it had lighted up a dormant arthritic condition.

### III. *The Issue.*

The single issue is whether the district court properly instructed the jury on a theory of aggravation of the plaintiff's preexisting condition as well as the "eggshell plaintiff" theory. Jury instruction No. 14 stated:

Evidence was presented indicating that Dena Sleeth has arthritis in her knees.

If you find Dena Sleeth had arthritis which caused her pain or disability before this accident and this condition was aggravated by this accident causing further suffering, then she is entitled to recover damages caused by the aggravation. She is not entitled to recover for any physical pain or disability which existed before the incident or for any injuries or damages which she now has which were not caused by the Defendant's actions. [aggravation instruction]

If you find Dena Sleeth had arthritis but without pain or disability before this incident and this condition made her more susceptible to injury than a person in normal health, then Tony Louvar is responsible for those injuries and damages experienced by Dena Sleeth which were proximately caused by Mr. Louvar's actions, even though the injuries claimed produced a greater injury than those which might have been experienced by a normal person under the same circumstances. ["eggshell plaintiff" instruction]

The trial court based its instructions on *Waits* and *Becker*, explaining its decision to instruct on both the aggravation and eggshell-plaintiff theories in this way:

Waits deals primarily with both of the instructions [eggshell plaintiff and aggravation], but if you are going to give them both that you basically need to give some additional guidance to the jury, and I've attempted to do that by adding some language to the uniform instructions and have tried to make that as clear as I think that it is possible. . . .

The jury awarded Sleeth $15,000. Past medical expenses were for $7499.95 of that amount, $1400 for past loss of full body;

$600 for future loss of full body, and $5500.05 for past and future pain and suffering. It is impossible to tell whether the jury awarded compensation for one knee or both knees, and it cannot be known whether the jury applied aggravation or eggshell-plaintiff principles in determining the amount of damages.

## IV. *Disposition.*

■ Alleged errors regarding jury instructions are reviewed for correction of errors at law. *Herbst v. State,* 616 N.W.2d 582, 585 (Iowa 2000). In *Waits,* as in the present case, the court instructed on both the aggravation and eggshell-plaintiff rules. In *Waits* the plaintiff had prior pain and disability because of an injury five years before the last injury. Her doctor testified the injury had healed, and "it was possible that Waits would be asymptomatic after her 1987 injury, but that her prior injury would make her more susceptible to a back injury in 1992." *Waits,* 572 N.W.2d at 576. The plaintiff testified she had no residual disability from her earlier injury as of the time of the collision in question. We said, based on the testimony of the plaintiff and her doctor,

> the jury could conclude that Waits' back condition was a nondisabling, asymptomatic condition that made her more susceptible to injury than a normal person.

*Id.* An eggshell instruction was therefore appropriate. The trial court in *Waits* also instructed on aggravation because a jury could find that at least some of the plaintiff's disability from her accident five years earlier was present at the time of her last accident. *Id.* at 577.

The plaintiff's orthopedic surgeon, Dr. David Hart, testified that he observed arthritis in her left knee during surgery and that, in his opinion, the plaintiff had arthritis in both knees before the accident.

However, he testified this was not necessarily disabling or painful as explained in this colloquy:

Q. Now, just because you have arthritis, does that mean you're going to have knee, and pain, and those types of things—knee problems, I mean. A. Well, not necessarily. It's possible that the ... accident kind of precipitated some of this.

Q. Okay. Did she give any history of any prior problems with her knees? A. I—I don't think I have any in my record that indicates that....

Q. So assuming she doesn't have— didn't have any problems with the knee beforehand, and had these arthritic changes in her knee—or at least some of those—what does the automobile accident actually do, if anything? A. Well, in my opinion, it would have ... aggravated her preexisting condition of osteoarthritis.

Q. Okay. And how does it aggravate it? A. Well, the ... direct blow ... it's already deteriorating a little bit, and you take a direct blow like a dashboard, a significant impact, it can cause some of that fragmentation to be worsened, loosen up some of that joint surface, spit some of those pieces of cartilage into the joint, cause inflammation.

The doctor was asked about apportioning Sleeth's disability between the preexisting arthritis and her disability following the recent accident:

> I want to ask you about the impairment rating [in the doctor's report]. Do you feel as if any portion of the impairment rating ought to be attributable to her preexisting arthritic condition, and a portion of it to any aggravation that may have happened in this accident?

The doctor responded:

> A. Well, I'll tell you, that's a very, very difficult thing and it's ... just pure

speculation on my part to apportion, you know, that.

... A. I mean, ..., to ask me to kind of assign a certain percentage to the car accident, I ... think that would be impossible to do that.

The colloquy continued:

Q. [What] is your sense of what may have been caused and what may not have been caused by the collision? A. Well, a situation like this ... quite frankly, go[es] a lot on historical evidence. And [I have] got a patient telling me her knees didn't hurt beforehand, had a direct blow, and ... has a problem, so, I mean—I hate to put it in too much of simple terms but that's ... what I base a lot of [my diagnosis] on.

A friend of the plaintiff, who was living in the same home at the time of the accident, testified she had never heard the plaintiff complain about any knee problems, and she had noticed no problems in her mobility. The plaintiff was able to get up and down stairs in her three-level home without any problems and was able to keep up with all of the chores around the home.

At the time of the accident, the plaintiff was living with a man named David Butler, who was also her business associate. He was asked questions about the plaintiff's condition prior to the accident:

Q. For the length of time that you've known Dena Sleeth, have you ever known her prior to this automobile collision to have had any problems with her knees or her legs? A. None whatsoever.

Q. Did she ever complain to you about any pain or problems she was having with the movement of her knees or legs? A. No.

. . . .

Q. Were you ever aware that she had arthritic knees or arthritis in the knees? .... A. No. She seems in very good shape, always was.

Q. In terms of getting around, moving around? A. Absolutely, absolutely. In fact, some of the security, she was in charge of [security at a beer tent] which is an extensive area, and there were some other accounts, too, that she handled very well, absolutely.

This witness further engaged in this colloquy:

Q. Up until this point in time, that is up until this automobile collision, you've described her activity level as normal in terms of her movement, legs and that type of thing, is that what you said? A. Yes.

The witness continued:

Prior to the accident Dena ... was in good shape, she really was. You know, we would wrestle around and she went through ... self-defense training. [The self-defense instructor] taught handcuff technique, she had, a straight baton and some other things, she was perfect [too]. She got a certificate on it. And I'm sure [the instructor] doesn't just pass anybody, he is a very strenuous instructor....

He testified that the plaintiff worked "forty, sixty, sometimes eighty hours" prior to the accident, and

it was sad to see her go up the stairs [after the accident] when before she would jump around, run around, we would have a good time, and after that we just couldn't do it.

The plaintiff testified that prior to the accident her activity level was normal. She said:

I would do and go wherever I wanted to do, go wherever I wanted to go and do whatever I wanted to do without any problems.

Q. Did you ever experience, that you know of, any problems in particular? When I say problems, I'm talking about difficulty using your knees, either one of your knees, prior to April 1 of 1998? A. No.

Q. Did you ever have any pain associated with it other than maybe striking an object of some kind? A. No.

Q. Now, have you experienced problems with your knees since the automobile collision? A. Yes, I have.

The plaintiff testified that she was not aware that she had arthritis in her knees before the accident, although she had had a "popping" in her knees. Her surgeon testified, in response to the question, "What does that [popping] mean to you as an orthopedist?".

Well, you know, joints typically make noise. That's a fact of life. And that, in and of itself, doesn't necessarily mean there is a problem. It could be a soft tissue click, it could be a bony click, or a hard cartilaginous surface clicking. In a ... joint that swells and has pain, it ... might be significant.

There was no evidence that Sleeth had any swelling in either knee.

■ The defendant points to no evidence that Sleeth had any disability or pain prior to the accident with Louvar. *See Waits,* 572 N.W.2d at 576 ("Notably, United Fire points to no testimony that [the plaintiff] had a two percent impairment *before the accident.*"). Louvar called no medical witnesses to contradict Sleeth's medical testimony that popping alone does not mean there is a problem.

■ When we weigh the sufficiency of the evidence to support an instruction, we "construe the evidence in a light most favorable to the party seeking submission[,]" here the defendant. *Sonnek v. Warren,* 522 N.W.2d 45, 47 (Iowa 1994). However,

the evidence must be substantial. *Walker v. Sedrel,* 260 Iowa 625, 632, 149 N.W.2d 874, 878 (1967) ("There is, of course, no duty to instruct on an issue without substantial support in evidence or which rests only on speculation or conjecture.").

The plaintiff's doctor testified it would be "a very, very difficult thing [to apportion the disability]" and "it's ... just pure speculation" to attempt it. Further, the popping noise was a joint, and "joints typically make noise. That's a fact of life." And it "doesn't necessarily mean there is a problem," according to the witness. The defendant presented no evidence on which the jury could assess the plaintiff's preexisting disability, if any. The jury would have to speculate on that issue, and speculation is not substantial evidence. *Walker,* 260 Iowa at 632, 149 N.W.2d at 878. The jury was not bound, of course, to believe the plaintiff or her witnesses. But, even the establishment of a lack of credibility in the plaintiff's case cannot fill the void in the defendant's proof of a preexisting disability—as opposed to a mere preexisting condition.

The court in *Newbury v. Vogel,* 151 Colo. 520, 379 P.2d 811 (1963), reversed the trial court for failure to give an eggshell instruction. It discussed the difficulty in apportioning disability between the recent trauma and a preexisting arthritic condition. The court held the jury should have been instructed on the eggshell rule in view of the difficulty in assessing the amount of preexisting disability:

Under the instructions given the jury was advised that the plaintiff could recover only that portion of his damage which was due to aggravation. If the jury could not make such apportionment (and it might well be that they could not, since two of the medical experts could not) they were left without an instruc-

tion as to the law which would apply in such circumstances.

*Newbury,* 379 P.2d at 813.

### V. *Conclusion.*

Here, it was error to submit an aggravation instruction because there was no substantial evidence of preexisting disability. We vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for a new trial.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED.**

All justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent.

Based on the facts presented concerning the cause of plaintiff's physical condition following the accident, the district court correctly instructed on both the eggshell-plaintiff doctrine and the rules for apportioning disability based on an aggravation of a prior physical condition. In *Waits v. United Fire & Casualty Co.,* 572 N.W.2d 565, 578 (Iowa 1997), we recognized that, when there is evidence from which the jury could either accept or reject a claim for apportionment of an injury or disability between a recent traumatic event and a physical condition preceding that event, both the eggshell-plaintiff instruction and an aggravation instruction should be given by the court. That is the situation here.

Plaintiff's accident occurred in April 1998. Plaintiff reported to Dr. David Hart, who performed surgery on her, that she was continuing to experience pain in her right knee in January 1999. Dr. Hart testified:

Q. And you've told the jury it's your feeling that the symptoms Ms. Sleeth has reported in her right knee were caused by the car accident of April 1, specifically that she had—may have had some preexisting arthritis in her knee, and that that may have been aggravated by bumping the dashboard in the accident? A. That's correct.

Q. Okay. Now, when you told the jury you thought when—Ms. Sleeth bumped her knees on the dashboard in this accident, am I to understand this aggravation injury is sort of like she had some loose arthritic fragments—fragments of her tendons and ligaments, and they were somehow bumped or maybe broken loose? A. Yes.

Q. And so the range—the range of time when the first symptoms could appear would be, at the earliest, immediately, and at the latest, within a month or so? A. I would think so.

Q. All right. It would be unusual to have symptoms cropping up four or six months after the accident? A. *Well, if they did, it's probably unrelated to the— traumatic incident.*

Q. You have explained to the jury your feelings about Ms. Sleeth's preexisting arthritic condition, and the fact that it may have been aggravated in this car accident. You've also assigned an impairment rating for her left knee. I want to ask you about the impairment rating. Do you feel as if any portion of the impairment rating ought to be attributable to her preexisting arthritic condition, and a portion of it to any aggravation that may have happened in this accident? A. Well, I'll tell you, that's is a very, very difficult thing, and it's—it's just pure speculation on my part to apportion, you know, that. I mean, *she had a significant preexisting condition that essentially would get her this impairment rating based on just*

*her condition, whether or not she was in a car accident.*

(Emphasis added.)

The opinion of the court mischaracterizes the issue in terms of whether plaintiff's arthritic condition prior to the accident was symptomatic. The critical question to be asked is whether some or all of the condition for which plaintiff sought recovery for disability and pain and suffering would have existed from the arthritis even if no accident had occurred. Dr. Hart's testimony was sufficient to permit the jury to find that it would have. In light of his testimony, it would have been error for the district court not to have given an aggravation instruction along with the eggshell-plaintiff instruction.

The fact that the medical experts who testified found it difficult to apportion a particular percentage of disability to the prior arthritic condition does not mean that the prior condition did not cause a portion of the posttraumatic condition for which damages are sought. It was equally difficult for these witnesses to state that the arthritis is not a cause of a portion of plaintiff's disability and pain and suffering after the accident, irrespective of the automobile accident. Their inability to resolve this factual issue in no way establishes that the issue does not exist. Because it did exist, it was a matter for the jury to resolve. The district court's instructions were a proper statement of the law for purposes of guiding the jury's resolution of the matter. I would affirm the judgment of the district court.