# IN THE COURT OF APPEALS OF IOWA

No. 15-0908
Filed November 9, 2016

**FRANKLIN DAVID BARKER,**
        Plaintiff-Appellee,

**vs.**

**UNION PACIFIC RAILROAD COMPANY,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

Union Pacific Railroad Company appeals the judgment entered following a jury's award of damages to Franklin Barker on his claim under the Federal Employers' Liability Act. **AFFIRMED.**

Thomas A. P. Hayden of Hayden Reinhart, L.L.C., Pittsburgh, Pennsylvania, Alice E. Loughran of Steptoe & Johnson L.L.P., Washington, DC, and Bruce E. Johnson of Cutler Law Firm, P.C., West Des Moines, for appellant.

Christopher H. Leach and Gene C. Napier of Hubbell Law Firm, L.L.C., Kansas City, Missouri, and Joseph M. Galligan of Galligan Reid, P.C., Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**VAITHESWARAN, Presiding Judge.**

Franklin Barker worked as a conductor for Union Pacific Railroad Company. After developing a condition affecting his kidneys, he sued the company under the Federal Employers' Liability Act (FELA), alleging he was required to perform "dangerously excessive amounts of work." Union Pacific defended in part by asserting Barker's genetic makeup made him susceptible to the condition. A jury awarded Barker $3,543,716. On appeal, Union Pacific contends (1) Barker failed to prove negligence or "present sufficient evidence on causation"; (2) the district court erred "by allowing expert testimony [from a treating physician] on causation"; and (3) the jury instructions were "erroneous and highly prejudicial."

## I.   *Negligence and Causation*

The jury was instructed Barker would have to prove the following elements of his claim:

> 1. [Union Pacific's] employees were negligent by failing to provide a reasonably safe workplace for [Barker].
> 2. [Union Pacific's] negligence played any part in causing [Barker's] injury and damages.
> 3. The nature and amount of damages.

Union Pacific takes issue with the first two elements of this instruction. Our review is for substantial evidence. *See Dudley v. Ellis*, 486 N.W.2d 281, 283 (Iowa 1992) ("If there is substantial evidence to support each of the elements of a plaintiff's claim, a motion for directed verdict or for judgment notwithstanding the verdict should be denied.").

*A. Negligence*

The jury was instructed negligence means "the failure to use ordinary care." *See Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 909 (8th Cir. 1980) ("The railroad is negligent if it knew or should have known that its assignment exposed the employee to an unreasonable risk of harm."). A reasonable juror could have found the following facts.

A minute before midnight on a cold night in January, Barker was assigned to a railroad yard in Ames. The person who had trained him to work in this yard recommended "that anyone that hasn't worked that yard with familiarity get a pilot[1] or someone that is more familiar with the yard than they are." The training supervisor testified Barker "did not have the experience to be working that yard by himself." He said he "probably instructed" Barker that, if he was unsure about something, "he should ask anybody, not just the manager, engineer, make a phone call, call up the dispatcher and say, I am having problems." He acknowledged "[m]anagers are very hard to get ahold of."

Barker confirmed that his training supervisor told him, "Don't come back to [the Ames] yard without a pilot or some other form of help. . . . This is too big a job for one person." When Barker received the assignment, he told the crew caller he was "not real familiar with that job" and he "needed help with it." The crew caller responded, "Your engineer has worked that yard a hundred times, and he will know everything you need for the job." Barker "did not get a pilot."

Barker completed the Ames job "just before noon." The job required Barker to walk approximately ten miles in the cold and snow, kneel to grab and

---

[1] According to Barker, "A pilot is an experienced conductor that can help with the work."

couple air hoses, fix air leaks along the way, reposition the train, and climb up and down the cars to pull and release hand levers and brakes.

At the end of his shift, Barker "noticed some stiffness and soreness." After returning to his home base, he was "very sore" and "[c]ould hardly stand up." Barker "knew he was hurting," and he told his manager the "job was way too difficult for one man to handle on his own." Barker subsequently experienced kidney failure, which, according to his physician Dr. Thomas, was caused by a muscle breakdown condition known as rhabdomyolysis.

A railroad safety consultant called by Barker testified that Barker was required to place ninety-six railroad cars together "in three tracks and they had to be doubled over to put them in one track and then once again separated because there wasn't room to get around them so there was quite a maneuver to accomplish all that." The consultant opined that Barker was required to perform "a tremendous amount of work" and

> with the incidentals like having to stop and walk again . . . plus the getting on and off the cars and the engines and all the hand brake sets and releases, ultimately the extra amounts of walking that had to be done and the air brake problems that took place, it was a phenomenal amount of work for the amount of time in which it was done.

He stated that, in his forty-five years in the business, he had never seen "this much work done or even assigned to a one-man crew or probably even a two-man crew." He continued, "Mr. Barker was given more work to do than should reasonably have been expected of a person" and it should have been "well known" to Union Pacific that the amount of assigned work could lead to injury.

He reiterated it "was extremely excessive for them to expect that amount of work out of one man in that location."

The jury reasonably could have found that Union Pacific failed to use ordinary care in assigning Barker work. The record contains substantial evidence to support the negligence element.

*B.    Causation*

"FELA's language on causation . . . 'is as broad as could be framed.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (citation omitted). The statute provides for "a relaxed standard of causation." *Id.* (citation omitted). The test "is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.*; *accord Fletcher*, 621 F.2d at 909 ("The test of causation under the FELA is whether the railroad's negligence played any part, however small, in the injury which is the subject of the suit.").

As noted, Dr. Thomas treated Barker for kidney failure, which he opined was caused by rhabdomyolysis. He explained that Barker's "muscle enzymes in the blood were very elevated" and "his muscle had severely broken down." He also testified the kidney damage was "permanent" and "progressive." When asked about Barker's later-diagnosed genetic condition known as LCHAD, he opined that Barker never manifested anything consistent with this condition. In his view, the level of exertion Barker described would have caused rhabdomyolysis regardless of any genetic factors. He rhetorically asked, "Why would we talk about birth defect when that happened 56 years ago? . . . [T]here was a very strong history of severe muscle exertion which is a very known cause

of muscle injury. So at that point I did not look for [LCHAD]." He summarized his opinion as follows: "Kidney failure obvious. Why? Rhabdomyolysis. Why rhabdomyolysis? Muscle exertion."

The jury also heard from an expert called by Union Pacific, who discussed a case study suggesting LCHAD caused rhabdomyolysis. This expert opined that the type of effort expended by Barker was "just not consistent with the development of exertional rhabdomyolysis that is laid out in the literature, in the scientific and medical literature."

The jury reasonably could have afforded Dr. Thomas' testimony more weight, given his first-hand knowledge of Barker's condition. *See State v. Jacobs*, 607 N.W.2d 679, 686 (Iowa 2000). The record contains substantial evidence to support the causation element. *See Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008) ("When reasonable minds would accept the evidence as adequate to reach the same findings, evidence is substantial.").

## II. Dr. Thomas' Qualifications

Union Pacific challenges Dr. Thomas' qualifications as an expert. The company argues his testimony "implicated at least three different scientific fields—genetics, physiology, and nephrology—and it is undisputed he lacked qualifications in two of those fields." The district court rejected this argument, reasoning, as follows: "The testimony at issue is from a board-certified kidney specialist about a recognized medical condition affecting kidneys. It is not testimony about some novel scientific or technical theory." Our review of this ruling is for an abuse of discretion. *See Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010).

Iowa has long been committed to a "liberal view on the admissibility of expert testimony." *Quad City Bank & Tr. v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 92 (Iowa 2011). But even if our state espoused a more stringent standard, Dr. Thomas would have easily satisfied that standard. Union Pacific concedes Dr. Thomas' expertise in kidney disease. His medical education, internship in internal medicine, and experience with direct patient care also afforded him expertise in physiology and genetics. In light of his background, the district court did not abuse its discretion in finding Dr. Thomas well-qualified to opine on Barker's condition.

### III. *Jury Instructions*

Union Pacific contends (A) the jury should have been instructed to apportion damages based on Barker's "preexisting condition" of LCHAD; (B) an instruction withdrawing assumption-of-risk as an issue was misleading; (C) the jury should have received a foreseeability instruction; and (D) the jury should have received a mitigation-of-damages instruction. Our review is on error. *See Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 891 (Iowa 2015).

### A. *Apportionment Instruction*

Union Pacific requested the following apportionment instruction:

> There has been evidence that [Barker] had a genetic disease, Long-Chain 3-Hydroxyacyl-CoA Dehydrogenase Deficiency ("LCHAD"), that pre-existed the events that are the subject of this lawsuit. In your deliberations, if you find for [Barker], you should distinguish between the amount of damages sustained by [Barker] as a result of the injuries claimed in this case and the amount of damages sustained by [Barker] as a result of his pre-existing conditions. [Barker] is not entitled to any damages you have determined are the result of his pre-existing conditions. Any award must not include damages that, because of [Barker's] preexisting LCHAD disease condition, probably would have

occurred anyway in the future if [Barker] had not had his first episode of rhabdomyolysis on January 30, 2007.

In declining to give this instruction, the district court reasoned in part as follows:

Apportionment may have been appropriate if Barker had manifested some known disability as a result of his LCHAD that was aggravated by the work performed for the railroad. However, there is no evidence in this case that Barker knew he had LCHAD or that he suffered some identifiable disability as a result of having LCHAD. Rather, this is a classic case for the "eggshell plaintiff" instruction, which was given.

The court's reasoning finds support in *Waits v. United Fire & Casualty Co.*, 572 N.W.2d 565 (Iowa 1997). There, our supreme court considered an instruction similar to Union Pacific's proposed instruction. The court stated:

[The] mere existence of a prior non-disabling, asymptomatic, latent condition is not a defense. A tort-feasor whose act, superimposed upon such a condition, results in an injury may be liable in damages for the full disability. In these cases the injury, and not the dormant condition, is deemed to be the proximate cause of the pain and disability.

*Waits*, 572 N.W.2d at 577 (citation omitted). As Union Pacific points out, *Waits* is not a railroad case under FELA. Nonetheless, the quoted language is instructive and finds support in FELA cases. *See McLaughlin v. BNSF Ry. Co.*, 300 P.3d 925, 935 (Colo. App. 2012) ("Giving an aggravation instruction is not appropriate where the pre-existing condition was asymptomatic, but is appropriate where there is evidence that the plaintiff had previously suffered pain or symptoms from the condition, and the condition allegedly was aggravated by the incident."); *cf. Stevens v. Bangor & Aroostook R.R. Co.*, 97 F.3d 594, 601, 603 (1st Cir. 1996) ("[I]f the factfinder cannot separate injuries caused or exacerbated by the accident from those resulting from a pre-existing condition, the defendant is liable

for all such injuries."); *Sauer v. Burlington N. R.R. Co.*, 106 F.3d 1490, 1494-95 (10th Cir. 1996) (finding "evidence that a substantial, identifiable portion of [the plaintiff's] injuries was not attributable to" the defendant).

Turning to the record, Dr. Thomas testified that Barker "did not manifest any signs of LCHAD prior to this episode." Dr. Thomas explained,

> Rhabdomyolysis can occur when somebody has LCHAD but when somebody has LCHAD the rhabdomyolysis should start at a very young age: Infancy, childhood, teenage. The fact that he never had any such manifestation in his entire lifetime up to the age of 55 tells me that . . . he has had no manifestations of LCHAD.

He also noted that the geneticists who diagnosed Barker with LCHAD "did not comment that that was the cause of his muscle breakdown or that is the cause of his muscle breakdown." Because Barker's LCHAD was latent, the district court had no obligation to give Union Pacific's proposed instruction. *See Sleeth v. Louvar*, 659 N.W.2d 210, 216 (Iowa 2003) (noting "defendant point[ed] to no evidence that [the plaintiff] had any disability or pain prior to the accident"); *Becker v. D & E Distrib. Co.*, 247 N.W.2d 727, 731 (Iowa 1976) (noting the plaintiff's "prior foot condition was asymptomatic before the collision and consequent leg injury" and "it was not disabling in any way").

In any event, the damages instruction given by the court exhorted the jury to assess only the amount "caused in any part by the defendant's negligence, as proved by the evidence." This instruction captured the concept Union Pacific hoped to convey through its proposed instruction. *See Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 823 (7th Cir. 1985) (noting the damages instruction was "sufficiently general to allow . . . the jury to adjust damages downward for the probability that something other than tortious misconduct would have triggered

[the plaintiff's] latent schizophrenia"). We conclude the district court did not err in declining to give the jury Union Pacific's proposed instruction on apportionment of damages.

### B. Assumption-of-Risk Withdrawal Instruction

The jury was instructed, "The law does not require that [Barker] assume the risks of his employment." Union Pacific characterizes this instruction as a withdrawal of the assumption-of-risk defense. The railroad concedes assumption of risk is not a viable defense in FELA cases and acknowledges the instruction is a correct statement of the law.[2] The railroad simply argues it solicited no evidence that Barker assumed the risk of his injury and, accordingly, the court should not have given the instruction.

To the contrary, Union Pacific elicited testimony from one of its managers regarding the level of work performed by employees and the type of assistance available to them. On direct examination by Union Pacific's attorney, the manager testified, "You could refuse the job and . . . they would probably call you in and ask you about. But, you know, . . . that's what you're hired to do is pick up a train by yourself." This testimony alone was sufficient to support the assumption-of-risk-withdrawal instruction. But there was more. As the district court stated:

---

[2] 45 U.S.C. section 54 provides:

> In any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to . . . any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury . . . resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury . . . of such employee.

> The combination of factors of the railroad's emphasis in its defense on the facts that the plaintiff was performing only duties that were part of his normal job, that he did not himself believe he was over-exerting himself, that his injuries were the consequence of a genetic condition and not over-exertion and the testimony of an engineer that for the plaintiff to ask for help would have been "going totally against what you agreed to when you were hired," led the court to conclude the assumption-of-risk instruction was warranted.

We discern no error in the court's ruling.

### C.     Foreseeability Instruction

Union Pacific proposed the addition of language to the instruction defining negligence.  Specifically, the railroad sought a paragraph highlighting its inability to foresee Barker's genetic condition.

"'[R]easonable foreseability of harm' . . . is indeed 'an essential ingredient of [FELA] negligence.'"  *CSX Transp., Inc.*, 564 U.S. at 703 (emphasis and citation omitted) (alterations in original).  "If negligence is proved, however, and is shown to have 'played any part, even the slightest, in producing the injury,' then the carrier is answerable in damages even if 'the extent of the [injury] or the manner in which it occurred' was not '[p]robable' or 'foreseeable.'"  *Id.* at 703-04 (emphasis and citation omitted) (alterations in original).  As our highest court stated, "[I]t is clear that Congress intended to greatly lower the bar for injured workers covered by the act, and to liberally allow recovery in cases that would not be allowed under general principles of tort law."  *Klein v. Chi. Cent. & Pac. R.R. Co.*, 596 N.W.2d 58, 60 (Iowa 1999).  Under this standard, the district court did not err in declining to amplify the jury instruction on negligence with additional facts detailing Union Pacific's claimed inability to foresee Barker's genetic condition.

*D.     Mitigation-of-Damages Instruction*

Union Pacific contends the district court erred in refusing to give its proposed mitigation-of-damages instruction.   The district court thoroughly addressed this issue as follows:

> While there is no doubt that a plaintiff is required to take reasonable steps to mitigate damages, the evidence in this case did not warrant giving such an instruction.  As to Barker's [two day] delay in seeking medical treatment, there is no evidence that he acted unreasonably by not seeking care sooner.   While the reasonableness of a delay in seeking care might not be the subject of expert testimony the evidence, in the court's view, would not have warranted even a lay conclusion of unreasonableness in Barker's conduct in seeking medical care.   More importantly, however, is the fact that there is no evidence that any delay contributed to a worsening of Barker's damages.   The same observation is true with respect to his failure to follow the recommended [low-fat] diet—there is no evidence that this failure contributed to his damages in any way.

We discern no error in this ruling.

Finding substantial evidence to support the elements of Barker's cause of action, no abuse of discretion in the district court's refusal to disqualify Dr. Thomas, and no error in the challenged jury instructions, we affirm the jury award in favor of Barker.

**AFFIRMED.**