# IN THE COURT OF APPEALS OF IOWA

No. 14-0165
Filed July 9, 2015

**DONNA CANAVAN,**
        Plaintiff-Appellant,

**vs.**

**JOE W. CONLAN, MICHAEL SAUSER,**
**and CS & R, LLC d/b/a**
**CORNERSTONE HOMES,**
        Defendants-Appellees.

_____

        Appeal from the Iowa District Court for Linn County, Ian K. Thornhill,

Judge.


        A home buyer appeals from an adverse judgment following jury trial of her

breach-of-contract, negligence, and misrepresentation claims against the seller.

**AFFIRMED.**


        Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellant.

        Jason J. O'Rourke and Benjamin Patterson of Lane & Waterman LLP,

Davenport, for appellees.


        Heard by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DANILSON, C.J.**

A home buyer appeals from an adverse judgment following jury trial of her breach-of-contract, negligence, and misrepresentation claims against the seller. Donna Canavan contends the trial court (1) erred in not granting a new trial when the jury's verdict was not sustained by sufficient evidence; (2) erred in failing to grant a directed verdict in regard to the individual liability of defendants Michael Sauser and Joe Conlan; (3) erred in submitting two special verdict questions to the jury; and (4) erred in instructing the jury regarding mitigation. She also contends she is entitled to a new trial because opposing counsel engaged in misconduct. Addressing only those claims properly preserved, and viewing the evidence in the light most favorable to the prevailing party, we conclude substantial evidence supports the jury's verdicts. The trial court did not abuse its discretion in its evidentiary rulings or in denying the posttrial motions. We therefore affirm.

**I. Background Facts and Proceedings.**

The jury could reasonably have found the following: Cornerstone Homes is an Iowa limited liability company owned by Michael and Kara Sauser and Joe and Gail Conlan. The company was formed to build houses in the Cedar Rapids area. In 2006, Cornerstone built a house at 1704 Wolf Drive Northwest, Cedar Rapids, and in August 2006, a certificate of occupancy was issued, which confirmed the house had been inspected and it complied with the requirements of the building code.

Donna Canavan visited the Wolf Drive house for the first time in August 2006 and learned that Cornerstone was the entity selling the house. Canavan

made an initial offer to purchase the house, which was less than the asking price, and the offer was rejected. Canavan visited the house again on September 11, 2006. She asked her realtor, Luann Steenhoek, to prepare another offer; Steenhoek prepared a purchase/sale contract, which was signed by Canavan as buyer and Joe Conlan and Michael Sauser as sellers that same day. The purchase agreement allowed Canavan to have a whole-house inspection. Canavan had the inspection performed. On September 25, 2006, Canavan, Steenhoek and Sauser attended a final walk-through of the house. At this time, Canavan had her first conversation with Sauser. Canavan asked Sauser if there were any easements on the property and if she could put a fence to the boundary. Sauser told her there were no easements on the property. Canavan identified three items during the final walk-through she wanted fixed, and Cornerstone took care of the items.

Closing was held on September 26, 2006. Cornerstone provided Canavan a one-year homeowner's warranty in connection with the sale, which provides in part:

> We spray the foundation walls with a tar waterproofing material. Although we make every effort to assure a dry basement, during times of excessive moisture, you may notice some dampness. . . .
> Cornerstone Homes will correct conditions that allow actual water to enter the basement unless the cause is improper installation of landscaping or failure to adequately maintain drainage.

After moving in, Canavan made arrangements to install a fence in her backyard. In the process of doing so, she learned there was an underground utility easement at the back of her lot. Canavan had a fence built on the

easement line, ten feet off the back property line. The city would have allowed her to install the fence on the property line subject to its removal in the event the city needed to access the utility within the easement, but Canavan chose to avoid the potential of removing the fence.

Canavan started to experience water in her basement in the spring of 2007. She informed Sauser of the problem, but he did not address her concerns. On July 16, 2007, a "pretty bad" storm hit the Cedar Rapids area—Canavan "lost power and it rained like all get out." She estimated three to four inches of rain fell in an hour. After the electricity went out, water entered her basement. Canavan called Sauser, and Sauser responded by going to Canavan's house. Sauser stayed until after midnight helping Canavan remove the water out of the basement. Sauser returned to Canavan's house the following day to help her carry items upstairs from the basement and clean up the remaining water. Sauser also had a contractor check Canavan's furnace and air conditioning unit and had another contractor help dry out her basement. Canavan was not charged for any of this work. Additionally, Cornerstone had a landscaper visit Canavan's property on July 17 to look at the property, redo the window wells, re-landscape the yard, and install drains in the backyard and tile up to the front of the house. Canavan had a discussion with Sauser the same day about trying to figure out what happened, and she acknowledged Sauser was willing to try and figure it out and help her.

After the July 2007 storm, Canavan also noticed water standing in certain areas in her backyard, which she discussed with Sauser, and he agreed to put drain tile in the backyard to keep water from pooling in the future. On August 6,

2007, a contractor installed tile in Canavan's backyard. Cornerstone paid the contractor for the work.

About the same time in August 2007, Sauser asked Canavan to put together a complete list of any items she wanted addressed under the warranty. Canavan gave Sauser a list of ten items that included various items typically seen by Sauser because the house was newly constructed. Sauser testified the items were addressed "within days of him receiving the list" and Canavan voiced no unhappiness about the way they were handled.

Sometime in the same month, Canavan contacted Tomlinson,[1] a company that performs basement waterproofing. Canavan received a proposal from Tomlinson to perform repairs to prevent further water from entering her basement. Canavan did not, however, hire Tomlinson to do the work.

Still not satisfied with Sauser's work or representations, Canavan contacted an attorney. On September 19, 2007, attorney James Holmes sent Cornerstone a letter on behalf of Canavan asking for an explanation how it was going to address the water drainage problems. Sauser called Holmes the day he received the letter and told him he would be happy to meet with Canavan, a contractor, and an engineer she selected to discuss the issues. On September 25, 2007, Holmes sent Sauser a letter attempting to schedule a time for the meeting. Sauser again called Holmes and reiterated his offer to meet with the attorney and anyone else Canavan wanted to address her concerns. Sauser

---

[1] The firm was named Tomlinson Cannon Cole in 2007. It later became Tomlinson Cannon. We will simply refer to the firm as Tomlinson.

received no return phone call or further communications from Holmes because Canavan would not agree.

Canavan alleged she had water in her basement again in 2008. Sauser was in the neighborhood frequently during that time building other houses. Canavan had Sauser's home and cellular telephone numbers. However, she did not contact Sauser about the 2008 water problem.

On September 25, 2008, Canavan filed the instant lawsuit, asserting claims of breach of contract, negligence, and misrepresentation. She sought punitive damages and the imposition of personal liability upon Conlan and Sauser.

On August 27, 2009, Canavan informed Sauser (through their respective attorneys) she was experiencing water in her basement. Sauser went to Canavan's home and took a concrete contractor, Rob McAllister of M.D. Concrete, with him. Sauser and McAllister presented Canavan with "a plan that could take care of the basement situation for her. She felt good about it, but needed to converse with her attorney first before we could proceed."

Beginning on August 28, 2009, and until October 2011, Cornerstone repeatedly offered to hire a contractor to fix the water intrusion at no cost to Canavan. Canavan did not allow the work to be done, nor did she hire anyone on her own. A mediation session was held in October 2011, and an agreement reached, after which Cornerstone hired Tomlinson to do repairs on Canavan's home. Tomlinson worked with Randy Van Winkle, an engineer Canavan selected, to evaluate a plan to address the water intrusion. Tomlinson proposed installation of new foundation drains and additional sump pumps. Van Winkle

concluded the proposed system was "the most likely and most appropriate method to ameliorate the water intrusion in [the] basement," and recommended proceeding with the repair. Tomlinson completed the work in December 2011 and provided a warranty in connection with its work. Cornerstone paid Tomlinson; Canavan was not required to pay for any of the repairs.

In October 2012, Canavan called Tomlinson back to the house to address a water problem that purportedly occurred in September 2012. The basement was dry when Tomlinson representative Russel Keeler arrived, which made it difficult for Tomlinson to determine what caused the asserted September water intrusion. Keeler informed Canavan's attorney's office that Tomlinson remained "willing to work on fixing the problem if—as soon as we knew there was something going on." Tomlinson was not called out to the property again until June 14, 2013. Canavan allowed Tomlinson to do additional work later in 2013. Tomlinson continues to stand by its warranty.

Canavan's claims of breach of contract (asserting defendants breached the one-year home warranty by not fixing the water intrusion problems), negligence (in the design and construction of the house), and misrepresentation (based on Sauser's statements that there were no easements) proceeded to a jury trial on September 30, 2013. The defendants moved in limine for a ruling limiting Canavan's proposed witness testimony concerning damages, specifically objecting to untimely disclosed expert witness testimony about diminution in value.[2] Canavan argued the proposed testimony by the listing realtor LuAnn

---

[2] Defendants' counsel argued the realtor "was disclosed as a witness who was going to testify as a realtor as what she has done, as the fact that she listed, and that she had

Steenhoek[3] was not expert testimony, and the realtor's attempts to sell the house were relevant to the issue of damages. Canavan also asserted the house had no value because it could not be "fixed." The court ruled it would allow the realtor to testify about "what efforts that she made to sell the property and if she said she's not able to sell it."

Also in their motion in limine, the defendants argued that any testimony about the house being in foreclosure was "inadmissible because it's not part of the recoverable elements of damages in a construction defect claim." The court asked Canavan's counsel about the relevance of foreclosure, and counsel responded,

> I think it's relevant because she [Canavan] has a problem with her house that is not fixable and, therefore, she ultimately figured she could no longer live there. As a result of the fact that she could not afford to pay rent and a mortgage and a second mortgage payment, her house went in foreclosure and that affects her ability to try and sell it for some discounted type of price on a short sale. It can't be sold.

The court ruled the fact the house was in foreclosure was irrelevant to the defective construction or the breach of contract claim, "[s]o we won't hear anything about that."

At trial, Steenhoek testified the house had been shown twenty to twenty-five times and no offers had been made. She stated that if a person was to go into the basement of the house today, one would see

---

seen water in the basement. Fine. She can testify to all that." However, counsel asserted, "She can't come in now and start offering all these opinions that have never been disclosed."

[3] By the time of trial, Canavan had moved out of the house, ceased making payments on it, and the house was for sale.

the inside of the basement floor, the perimeter, has the concrete that's been cut out and there's something below the concrete—I imagine it's tiling—all around the perimeter and down the middle of the foundation. And there's the original sump pump that was there when she bought it, the pit. And now there's two additional sump pits with pumps in it. So there's three pits now.

Steenhoek testified the house was not saleable. On cross-examination, defendants' counsel questioned Steenhoek about having had only one open house in trying to sell the property. At Canavan's counsel's behest, a discussion was held outside the presence of the jury. Canavan's counsel asserted that defense counsel "knew full well the reason why she hadn't had any open houses" was because the house was in foreclosure, and argued, "I believe [defense counsel] has opened the door on the fact that it is in short sale and in foreclosure . . . but she's prohibited from giving that explanation because of the court's order in limine." The trial court ordered a recess. Upon resuming the proceedings, the court stated:

> When we broke we were discussing this issue regarding the cross-examination of Ms. Steenhoek, and I thought about this and I've pretty much been put in a position where whatever decision I make it's pretty much an invitation to introduce error to this trial, something that I think could have easily been addressed before it came up rather than after, so I'm really not very pleased about that. But we can't unring that bell. It's obvious to me that, [defense counsel], you knew that this line of questioning at least got intertwined with an issue that was clearly part of a limine ruling, a limine motion that you brought up, and instead of giving the court a heads up and giving me a way to deal with this before we got this out in front of the jury, we went down this road. And now, again, as I said, I'm pretty much put in a position where whatever decision I make going forward here is an invitation of error down the road. But I've thought about it, and I feel that the lesser of the two potentially negative decisions here is, [plaintiff's counsel] Mr. Riley, I'm going to let you ask her why she didn't have any open houses, but I'm not going to let her state as one of the reasons the short sale/foreclosure. I've read this transcript. She indicates the appearance of the basement, the sump pump issue that she's

already talked about. She indicates here in her deposition a concern of, you know, what if it's a rainy day, that sort of thing. You can certainly ask her about that. But I limined out the foreclosure issue because it is so completely irrelevant to the issues in this case and it invites so many tangential issues and potentially invites the jury to rely on the motion [sic] rather than facts that I'm not going to allow the witness to state the short sale and foreclosure as one of the reasons why she didn't have an open house.

Canavan's counsel made an offer of proof, wherein Steenhoek stated one of the reasons she did not have more open houses was because "I'm in this to make money, and Donna's house is not as saleable as other properties as I have because of the basement and being in a short sale/foreclosure." Steenhoek was cautioned not to mention the foreclosure when questioning resumed. On redirect, Steenhoek was asked why she "did not feel that Miss Canavan's house was an appropriate candidate for an open house," to which she replied:

Well, number one, it was vacant. Number two would be the basement. I couldn't predict if it was going to rain and if there would be water in the basement. I wouldn't want to have an open house if it was a wet basement, the weather. And just being busy with other open houses.

During trial, Thomas Hart, the Public Health Environmental Supervisor with the Linn County Board of Health, testified that he visited Canavan's property in August 2007 and returned to the property in 2009. Hart concluded the water intrusion in the basement was caused by a high "sand lens." He explained a sand lens is a phenomenon where soils are different; some of the soil under the house may be restrictive and some very permeable. When more permeable soils such as sand conduit water, they can act like a pipeline, which effect is called a sand lens. According to Hart, a sand lens could be overlooked in the building process because it is a random occurrence and can only be determined with

certainty by excavation. Hart also testified that he was very familiar with Tomlinson and he was of the opinion that Tomlinson was competent to resolve any water problem caused by a sand lens.

Sauser testified he estimated he had been involved in the construction of approximately 400 homes throughout his career. He had never experienced a sand lens before this situation and, in fact, had never even heard of them. Sauser testified there was no indication during the construction of the home that the sand lens was present.

Sauser also testified that at the time he told Canavan there were no easements on the property, "I did not intend to deceive her. I was only telling her what I knew." Sauser stated that when Canavan later talked to him about building a fence to the back boundary of her property, Sauser called Deanna Thomas with the City of Cedar Rapids, who advised a fence could be built to the boundary. Sauser assumed her comment meant there was no easement. A utility easement does run along the back of Canavan's property.

The defendants moved for directed verdict on claims of negligence, punitive damages, and misrepresentation. With respect to the negligence claim, the defendants asserted it was barred by the economic loss doctrine. They also asserted Sauser and Conlan were not personally liable because Cornerstone was a disclosed principal.

For her part, Canavan moved for a directed verdict "on the issue of [personal liability of] Joe W. Conlan and Michael Sauser on the obligations under the September 11, 2006, [purchase/sale] contract." Counsel argued that

because the two had signed the sales contract without noting they were signing

for Cornerstone, they were individually liable. The court reserved ruling.

Canavan made no objections to the district court's proposed instructions.

Canavan's counsel stated:

> Our objections go to issues of submissibility.
> We object to Questions Number[s] 1 and 2[4] for the reasons set forth in our motion for directed verdict on the issue of personal liability. We do not believe that the contract is unambiguous and, therefore, we do not believe that there's a jury issue on capacity.
> We object to the submission of Question Number 5 on the questions of whether the property can be or has been repaired on the basis that there is no evidence in the record other than that the property has not been repaired and there is no evidence of any possible repair which could work.
> And so those would be the Plaintiff's objections to the instructions, Your Honor.

Those objections were overruled.

The jury was instructed that to prove her claim of breach of contract,[5]

Canavan was required to prove all of the following propositions:

> 1. The existence of a contract.
> 2. The terms of the contract.
> 3. The plaintiff has done what the contract requires.
> 4. The defendant has breached the contract.
> 5. The amount of damage defendant has caused.
> If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, then you will consider the defense of failure to mitigate as explained in Instruction No. 13.

On Canavan's negligence claim, the jury was instructed:[6]

> The Plaintiff claims the defendants were at fault in one or more of the following particular(s):
> Design and construction of Plaintiff's home.
> This ground of fault has been explained to you in other instructions.

---

[4] The jury questions are set forth in full below.
[5] Instruction No. 9 contained the breach-of-contract elements.
[6] Instruction No. 15 was the negligence claim.

The plaintiff must prove all of the following propositions:

1. The defendant was at fault. In order to prove fault, the plaintiff must prove Defendants were negligent in the construction of the Plaintiff's home.

2. The defendant's fault was a cause of the plaintiff's damage.

3. The amount of damage.

If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, then you will consider the defense of comparative fault as explained in Instruction No. 29.

And, concerning Canavan's misrepresentation claim, the jury was instructed[7]:

The plaintiff must prove the following propositions by a preponderance of clear, satisfactory and convincing evidence to establish her fraudulent misrepresentation claim:

1. Michael Sauser made a representation to plaintiff that plaintiff could erect a fence to the property line and there were no easements on the property.

2. The representation was false.

3. The representation was material.

4. Michael Sauser knew the representation was false.

5. Michael Sauser intended to deceive plaintiff.

6. The plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation.

7. The representation was a cause of the plaintiff's damage.

8. The amount of the damage.

If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, the plaintiff is entitled to recover damages against Michael Sauser and against Michael Sauser's employer, CS&R, LLC, if done within the scope of Michael Sauser's employment, in some amount.

The jury answered the submitted questions, in pertinent part:

**Question No. 1:** Do you find Defendant Joe W. Conlan was acting in his individual capacity when he signed the contract to sell the property located at 1703 Wolf Dr. N.W., Cedar Rapids, Linn County, Iowa?

Answer "Yes" or "No."

---

[7] The misrepresentation claim elements were stated in Instruction No. 19.

**ANSWER: <u>NO</u>**

**Question No. 2:** Do you find Defendant Michael Sauser was acting in his individual capacity when he signed the contract to sell the property located at 1703 Wolf Dr. N.W., Cedar Rapids, Linn County, Iowa?

Answer "Yes" or "No."

**ANSWER: <u>NO</u>**

**Question No. 3:** Do you find that Donna Canavan has proven her breach of contract claim?

Answer "Yes" or "No."

**ANSWER: <u>NO</u>**

**Question No. 4:** Do you find that Donna Canavan has proven her negligence claim?

Answer "Yes" or "No."

**ANSWER: <u>NO</u>**

(If you answered "No" to both Question No. 3 and Question No. 4 do not answer Question Nos. 5 through 9, and go to Question No. 10. . . .

. . . .

**Question No. 10:** Has Donna Canavan established her claim for fraudulent misrepresentation?

Answer "Yes" or "No."

**ANSWER: <u>NO</u>**

(If you answered "No," do not answer any further questions. If you answered "Yes," answer Question No. 11.)

Canavan's motions for new trial and judgment notwithstanding the verdict were denied. The court concluded that "[v]iewing the evidence in the light most favorable to defendants," the jury's verdict "in all regards" was "supported by

substantial evidence and effectuates justice." Concerning her claim that Conlan and Sauser acted in their individual capacities and were thus individually liable, the court ruled, "The question of whether Conlan and Sauser signed the contract as individuals rather than representatives of Defendant Cornerstone Homes was a question of fact properly put to the jury." In addition, the court ruled substantial evidence supported the jury's findings that neither was acting in an individual capacity when dealing with Canavan.

On appeal, Canavan raises the five issues previously identified.

## II. Scope and Standards of Review.

Our review of a district court's ruling on a motion for new trial depends upon the grounds raised in the motion. *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 859 (Iowa 2001). "If the motion for a new trial was based on a discretionary ground, we review it for an abuse of discretion. If the ruling granting a new trial was prompted by a motion based on a legal question, . . . our review is for errors at law." *Olson v. Sumpter*, 728 N.W.2d 844, 848 (Iowa 2007) (citations and internal quotation marks omitted).

We review a district court's ruling on a motion for directed verdict for correction of errors at law. *Pavone v. Kirke*, 801 N.W.2d 477, 486 (Iowa 2011).

"'We review alleged errors in jury instructions for correction of errors at law.'" *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) (citation omitted). "Any error in the instructions given does not merit reversal unless it results in prejudice." *Id.* (citation omitted).

**III. Discussion.**

    *A. Motion for new trial.* Canavan moved for a new trial, asserting there was insufficient evidence to sustain the verdicts, and opposing counsel's misconduct denied her of a fair trial.

    *1. Sufficiency of the evidence to support jury's findings.* "If a jury verdict is not supported by sufficient evidence and fails to effectuate substantial justice, a new trial may be ordered." *Olson*, 728 N.W.2d at 850. Canavan's claim on appeal is that there is "not a scintilla of evidence" to support the jury's rejection of her claims. But this assertion is premised upon her contention that the testimony of Conlan and Sauser was "incredible based upon numerous false statements and perjured testimony." The jury apparently disagreed.

    Issues of credibility are particularly in the purview of the jury. *Becker v. D & E Distrib. Co.*, 247 N.W.2d 727, 730 (Iowa 1976) ("The weight and credibility of testimony are matters for the jury," and "[t]his rule applies even though there are contradictions or inconsistencies in the testimony of a particular witness."). "The function of the jury is to weigh the evidence and place credibility where it belongs." *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006). Here, Canavan contends Sauser misrepresented facts and gave inconsistent statements. However, the jurors were free to accept or reject any part of each witness's testimony and to give the testimony the weight they thought it should receive. *See id.* We will not interfere. *See Trapalis v. Gershun*, 145 N.W.2d 591, 596 (Iowa 1966) ("The jury's verdict was within the evidence. It is not for us to pass on the weight and credit of the testimony. That is what juries are for.").

We also note the jury could have concluded it was not negligent to build a house on a sand lens because such an event occurs only randomly and can only be ascertained by excavation. Sauser testified he had built over 400 homes and never before heard of, or experienced, a sand lens. No expert testimony was presented to establish Cornerstone was negligent for building the house on this site. The jury also could have concluded that Cornerstone, through Sauser's actions, acted reasonably to satisfy Canavan's warranty claim and by the time of trial the water problem had been resolved through the efforts of Tomlinson.

*2. Misconduct.* Canavan also asserts her motion for new trial should have been granted based upon defendants' counsel's questioning the realtor about her lack of holding open houses, knowing one reason she had not held additional open houses was because the property was in foreclosure.

Denial of a motion for new trial "based on a discretionary ground such as misconduct" is reviewed for an abuse of discretion. *Loehr v. Mettille*, 806 N.W.2d 270, 277 (Iowa 2011). "'A court abuses its discretion when its ruling is based on grounds that are unreasonable or untenable.'" *Giza v. BNSF Ry. Co.*, 843 N.W.2d 713, 718 (Iowa 2014) (quoting *In re Trust No. T–1 of Trimble*, 826 N.W.2d 474, 482 (Iowa 2013)).

In her motion for new trial, Canavan asserted defendants' counsel engaged in misconduct "by knowingly eliciting testimony which could not be fully explained without violating the court's order in limine," which justified a new trial. The trial court, however, "reaffirm[ed] its trial rulings." The trial court wisely allowed Steenhoek to explain why she did not have more open houses, excluding one of several reasons—that the house was in foreclosure. Those

reasons included the appearance of the basement, the sump pump issue, the uncertainty of the weather, the fact she did not believe Canavan's house was saleable. The district court found the fact the house was in foreclosure "invites so many tangential issues" and could lead the jury to decide on an improper basis. These are not unreasonable or untenable grounds—we find no abuse of discretion.

**B. Directed Verdict.** Canavan also asserts the district court erred in failing to grant her motion for directed verdict of individual liability for Conlan and Sauser, pointing out each signed the purchase agreement without designating they were signing on behalf of Cornerstone Homes.

> A directed verdict is required only if there was no substantial evidence to support the elements of the plaintiff's claim. Evidence is substantial when reasonable minds would accept the evidence as adequate to reach the same findings. Where reasonable minds could differ on an issue, directed verdict is improper and the case must go to the jury. Thus, our role is to determine whether the trial court correctly determined if there was substantial evidence to submit the issue to the jury. In doing so, we must view the evidence in the light most favorable to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury.

*Pavone*, 801 N.W.2d at 486-87 (alterations, citations, and internal quotation marks omitted).

We agree with the district court that Canavan was not entitled to a directed verdict on the issue of Conlan's and Sauser's individual liablity. Canavan concedes she knew Cornerstone was involved in the real estate she purchased. Nonetheless, citing *Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 721

(Iowa 1994),[8] Canavan argues that when a corporate officer signs a document without making clear that they are signing on behalf of the corporation, the officer is personally liable for the document signed. The defendants counter by citing the legal principle that an agent acting within the scope of the agent's authority on behalf of a disclosed principal is not personally liable. *See Cryder Well Co. v. Stangl*, 136 N.W.2d 519, 521 (Iowa 1965) (stating "[n]o novel propositions of law are involved . . . [a]n agent acting within the scope of authority for a fully disclosed principal is not personally liable to a contracting third party"). The trial court correctly ruled a factual issue existed, which was properly submitted to the jury. *See id.* ("This is primarily a question of fact.").

Here, Conlan and Sauser both testified they did not intend to be bound personally, but signed the purchase agreement that Canavan's realtor drafted and provided on behalf of Cornerstone. They did not personally own the house or the real estate. Canavan testified she was aware the house was being offered for sale by Cornerstone. The warranty names Cornerstone. We agree a factual issue was raised and was properly submitted to the jury. The jury's decision was supported by substantial evidence.[9] Finding no error, we affirm on this issue.

*C. Jury Questions.* Canavan asserts on appeal that the trial court improperly submitted Question Nos. 5 and 13 to the jury.

Question No. 5 asked, "If you answered 'Yes' to either Question No. 3 [did plaintiff prove breach of contract], Question No. 4 [did plaintiff prove negligence],

---

[8] In *Kuehl*, the court found the president and sole owner of an insurance agency intended to be personally bound by his signature on an agreement to sell the agency. *See* 521 N.W.2d at 720.

[9] Canavan also contends the "mere presentation" of Question Nos. 1 and 2 may have had an adverse effect on the jury's verdict. We find this claim speculative at best.

or both, do you find the defect(s) in the property located at 1703 Wolf Drive N.W., Cedar Rapids, Linn County, Iowa, can be, or has been, repaired?  Answer 'Yes' or 'No.'"

Question No. 13 asked: "Do you find by a preponderance of clear, convincing and satisfactory evidence Michael Sauser was acting within the scope of his position as an officer of CS&R, LLC when making his fraudulent misrepresentation to Donna Canavan?  Answer 'yes' or 'no.'"

We address only Question No. 5 because Canavan did not object to Question No. 13 or to the other jury instructions—including the affirmative defense of mitigation—in the district court.  *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

On appeal, Canavan asserts the court erred in submitting Question No. 5 to the jury because "there was no evidence other than the fact the water problem hasn't been fixed, to support whether the problem could actually be fixed."  She argues that the terms of the warranty guaranteed the defendants would correct any problem that caused water to enter the basement and they failed to do so.

The defendants assert the issue is irrelevant on appeal because the jury did not reach the question, and Canavan has suffered no prejudice.  We agree.

"We review a claim that the district court gave an instruction not supported by the evidence for correction of errors at law."  *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496 (Iowa 2014).  Here, however, even if we assume there was not sufficient evidence to support the instruction, errors in instructions

do not "warrant reversal unless the instruction prejudiced the complaining party." *Anderson v. Webster City Cmty. Sch. Dist.*, 520 N.W.2d 263, 267 (Iowa 2000). Because the jury did not reach the question, Canavan has suffered no prejudice.

Viewing the evidence in the light most favorable to the prevailing party, substantial evidence supports the jury's verdicts. The trial court did not abuse its discretion in its evidentiary rulings or in denying the posttrial motions. We therefore affirm.

**AFFIRMED.**