# IN THE COURT OF APPEALS OF IOWA

No. 16-1079
Filed July 19, 2017

**JEANNE ELIZABETH GRIMM,**
    Plaintiff-Appellant,

**vs.**

**CARLI RAE CHILCOTE and TIMOTHY DAVID CHILCOTE,**
    Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Black Hawk County, David P. Odekirk, Judge.


        Jeanne Grimm appeals the jury's verdict in a tort suit based on a vehicle accident. **REVERSED AND REMANDED FOR NEW TRIAL.**


        Jay A. Nardini of Nardini Law Office, Cedar Falls, for appellant.

        Gary D. Goudelock, Jr. of Idleman & Goudelock, Des Moines, for appellees.


        Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, Chief Judge.**

Jeanne Grimm appeals the jury's verdict in this vehicle-collision suit against driver Carli Chilcote and the owner of the vehicle, Timothy Chilcote.[1] Jeanne contends the $7027 verdict is inadequate, fails to do substantial justice between the parties, and asserts an error in giving a jury instruction not supported substantial evidence resulted in prejudice.

Jury instruction 18 was not supported by the evidence and prejudicially introduced an improper legal theory to the jury. A new trial on the scope and amount of damage caused by the admittedly negligent conduct is required.

**I. Background Facts and Proceedings.**

At about noon on Saturday, November 17, 2012, Jeanne was driving her 2003 Chevy S10 four-door extended cab pickup, which weighed about 3600 pounds. Jeanne had been traveling about forty-five miles per hour but had to slow to a near stop to allow the vehicle in front of her to turn into a private drive. Jeanne was then rear-ended by sixteen-year-old Carli, who was driving her father's 1990 Chevrolet K1500 pickup truck, which weighed about 4200 pounds and had a snowplow-mount attachment on the front of the truck and a lift gate on the rear. Carli believed she was traveling about ten miles per hour at the time of impact. When her father, Timothy, arrived at the scene, he observed the two trucks had come to rest about two feet apart.

Before the collision, Jeanne was physically active, had full use of her body, and could lift heavy items without pain. Jeanne described the impact of

---

[1] Because more than one party has the same last name, we will refer to all by their first names in the remainder of this opinion.

being hit as "very jarring," "[v]ery startling," and noted "it threw me forward and my seatbelt caught and my head kind of snapped back and hit the head rest." Jeanne stated the collision moved her truck forward about two feet. Jeanne did not have any pain immediately following the impact. Later that evening, however, Jeanne developed a headache and neck pain. By the following morning (Sunday) the headache had worsened and Jeanne described her neck as "very stiff Sunday morning . . . and just got progressively worse during the day." She has had intermittent pain and treatment since. The cost to repair Jeanne's truck was $2063.64.[2]

Jeanne filed suit against Carli and Timothy for personal injuries suffered by Jeanne arising out of the November 17, 2012 motor-vehicle collision. The Chilcotes did not deny liability but contested the extent of Jeanne's damages. The case was tried to a jury between March 8 and March 14, 2016. Jeanne's objection to jury instruction 18[3] was overruled. The jury returned a verdict in favor of Jeanne for $7027, awarding $1625 for past pain and suffering, $2000 for the "past loss of fully body [sic]," $3000 in past medical expenses, and $402 in past lost wages. They awarded no future damages.

Jeanne filed a motion for a new trial, contending the damages were inadequate and failed to do substantial justice. She also argued instruction 18 should not have been given and was prejudicial. The motion for new trial was overruled. Jeanne appeals.

---

[2] Jeanne received an employee discount on repair services.
[3] Instruction 18 provided: "If you find Jeanne Elizabeth Grimm was injured by another act after this incident, she cannot recover for any later injury or aggravation of injury not caused by this incident."

**II. Scope and Standard of Review.**

Our review of a district court's ruling on a motion for new trial depends upon the grounds raised in the motion. *Bryant v. Parr*, 872 N.W.2d 366, 375 (Iowa 2015). If the motion for new trial was based upon a discretionary ground, we review the court's ruling for an abuse of discretion. *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 609 (Iowa 2006). On the other hand, if the motion was based on a legal question, we review the court's ruling for errors of law. *Id.*

We review challenges to jury instructions for the correction of errors at law. *Sleeth v. Louvar*, 659 N.W.2d 210, 213 (Iowa 2003). We will not reverse a verdict due to an erroneous instruction unless the error was prejudicial. *Waits v. United Fire & Cas. Co.*, 572 N.W.2d 565, 569 (Iowa 1997). Instructions may be considered erroneous if they contain a material misstatement of the law, are not supported by the evidentiary record, or are conflicting and confusing. *Id.* at 575. "When we weigh the sufficiency of the evidence to support a requested instruction, we review the evidence in the light most favorable to the party seeking the instruction." *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 824 (Iowa 2000).

**III. Discussion.**

Jeanne asserts the trial court abused its discretion in denying her motion for new trial because the jury awarded inadequate damages, the verdict failed to administer substantial justice, and the verdict was not supported by sufficient evidence. She also contends the court erred in giving instruction 18. We find the two issues are intertwined and not easily discussed separately.

*A. Motion for New Trial.* A new trial may be granted under Iowa Rule of Civil Procedure 1.1004(4) where there is "[e]xcessive or inadequate damages appearing to have been influenced by passion or prejudice." "The district court has considerable discretion in ruling upon a motion for new trial based upon the ground that the verdict was inadequate." *Fisher v. Davis*, 601 N.W.2d 54, 57 (Iowa 1999).

A district court also has broad, but not unlimited, discretion to determine whether a jury's verdict effectuates substantial justice between the parties. Iowa R. App. P. 6.904(3)(c); *see also Estate of Hagedorn ex. rel. Hagedorn v. Peterson*, 690 N.W.2d. 84, 87 (Iowa 2004). We review the trial court's decision about whether the verdict administers substantial justice for an abuse of discretion. *Hagedorn*, 690 N.W.2d at 87. A court abuses its discretion when its ruling is "clearly untenable or to an extent clearly unreasonable." *State v. Wilson*, 878 N.W.2d 203, 210-11 (Iowa 2016). An erroneous application of the law by the district court is clearly untenable. *Id.* at 211.

> "If uncontroverted facts show the amount of the verdict bears no reasonable relationship to the loss suffered, the verdict is inadequate." Thus, the adequacy of a damage award depends on the facts of the particular case. If the damages are inadequate, the trial court must either grant a new trial or, if appropriate, grant an additur.

*Pexa v. Auto Owners Ins.*, 686 N.W.2d 150, 162 (Iowa 2004) (citations omitted).

There is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. *Olson v. Nieman's Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998). In Iowa, the plaintiff bears the burden of establishing a claim for damages with some reasonable certainty and for

demonstrating a rational basis for determining their amount. *Conley v. Warne*, 236 N.W.2d 682, 687 (Iowa 1975); *Hammes v. JCLB Props., LLC*, 764 N.W.2d 552, 558 (Iowa Ct. App. 2008).

Jeanne notes she had never injured her neck or her right shoulder prior to November 17, 2012, nor had she been in a motor vehicle collision. Her physician, Dr. Matthew Smith, indicated he had seen Jeanne occasionally over a two-year period prior to the collision and Jeanne did not present complaints of neck or shoulder pain. Jeanne then saw Dr. Smith on Monday, November 19, 2012. Objective notes state she had a good range of motion of her neck with some tightness (muscle spasm) and a lot of diffuse musculoskeletal tenderness along her neck muscles. His assessment was "neck pain/MVA [motor vehicle accident]/whiplash." He explained to Jeanne the method by which one suffers a whiplash type injury in a rear-end collision and told her to take three ibuprofen at a time three to four times a day and use ice on her neck for two weeks followed by heat for two weeks. He prescribed a muscle relaxant, Flexeril, for her to take, and told her to come back in two weeks.

Dr. Smith next saw Jeanne on November 30 for follow up of her neck pain, and she was still having sharp pain in her neck and right shoulder. He ordered her to undergo physical therapy at Accelerated Rehabilitation where she started on December 5. Dr. Smith hoped a course of physical therapy would clear up Jeanne's problem, noting approximately ninety percent of patients who have neck pain will get a good resolution in six weeks, about ten percent do not.

On December 6, 2012, after her first physical-therapy treatment, Jeanne was seen by Dr. Smith's partner, Dr. Musgrave. Jeanne reported her physical-

therapy treatment the night before had left her with a very painful and stiff neck. Physical examination showed very limited range of motion of her neck and a very tender area right at C7, at the base of her neck, with muscle spasms in her right side neck muscles. Dr. Musgrave ordered an X-ray of her neck, prescribed a narcotic pain pill, Vicodin, and told her to not have physical therapy for a few days. Her X-ray was negative for any fracture.

Dr. Smith next saw Jeanne on December 13 and told her to continue with her conservative treatment of muscle relaxers, anti-inflammatories, pain pills, and physical therapy. If she had no improvement, then he would consider ordering an MRI, which would show more detail than an X-ray.

Dr. Smith again saw Jeanne on January 16, 2013. Jeanne reported she was doing a little better and having some good days with no pain. She had one more therapy session left with Accelerated Rehabilitation. Dr. Smith encouraged her to get off the pain medications and the muscle relaxers, which could be masking the pain, and to see how she felt and to come back in six months or sooner if she continued to have pain. He also referred her to a massage therapist to try and loosen up her muscles. He said muscle spasms are nothing a person can fake.

Jeanne began seeing a licensed massage therapist at Allen Hospital, Pam McKinney, on January 31, 2013.[4] McKinney noted Jeanne had much decreased range of motion, especially on the right side, and very hypertonic tissues. McKinney testified a normal muscle is able to contract and then relax, but when

---

[4] The charges for massage therapy set by Allen are $41 for a half hour and $61 for a full hour. Her health insurance did not cover massage therapy.

the muscle is hypertonic it contracts and stays contracted. Jeanne went to McKinney about once a week and would get good relief from each treatment but the relief was temporary.

Near the end of March, Jeanne tried extending the massages to every two weeks, but Jeanne's neck muscles were even more knotted and hypertonic. Jeanne found it more helpful to be seen once a week, which increased the cost for her. McKinney testified there was an area at the base of Jeanne's neck that when touched produced a "zinging" shock sensation. McKinney opined the zinging sensation is caused by a nerve being pressured by the hypertonic muscles. McKinney was herself in a car accident on May 30, 2013, and could not treat Jeanne so she referred her to a physical therapist, Dr. Jodi Reyerson.

On June 11, 2013, Jeanne went to see Dr. Smith complaining of neck pain. His assessment was continued pain status post motor-vehicle accident. He referred her to get an MRI of her neck, which indicated some mild arthritis in her neck and a mild bulging disc at C5-C6. Dr. Smith also prescribed a second course of physical therapy at Accelerated Rehabilitation, which Jeanne attended from June 12 to August 1, 2013.

Jeanne attended sessions with Dr. Reyerson twenty-five times at $70 per session between July 17, 2013, and March 5, 2014,[5] and five times at $80 per session between September 2015 and February 2016. Dr. Reyerson does not accept insurance, and Jeanne paid for treatment out of pocket.

---

[5] Dr. Reyerson took a sabbatical, closing her practice from March 2014 to September 2015.

Dr. Reyerson treats a client's joints and nervous system. When Dr. Reyerson first saw Jeanne in July 2013, she had limited mobility of her neck, a forty-percent deficit of her cervical range of motion, "pretty significant pain" at the end of the range, and a "really rigid" neck. Testing indicated nervous system irritability and lymphatic congestion, which "you see . . . with soft tissue injury commonly." Dr. Reyerson testified:

> The first thing I did with [Jeanne] is called primal reflex release technique and that basically works with [the] primitive reflexes that we all have. This is the nervous system quieting technique that I use and then I used mechanical link which is a soft tissue release technique and craniosacral therapy. I moved the deep soft tissues of the brain and the spinal cord. And then everything resolved really well that day and that day I was really encouraged. I thought I was [Jeanne's] answer after almost a year of injury.
> . . . .
> . . . Her range of motion normalized and we were both pretty surprised and so I thought that I would be done with [Jeanne] in about six sessions and that she would be pain free and able to resume her activities without problems.

But that did not occur. Jeanne would have decreased pain and improved posture and mobility with a treatment but would again have tenderness of the neck and stiffness upon return. Dr. Reyerson testified the "explanation" for only temporary relief is Jeanne has "ongoing injury, injury that's not fully recovered."

Dr. Smith referred Jeanne to Dr. Frank Hawkins, who is board certified in pain medicine and provides services at Allen Pain Clinic. Dr. Hawkins first saw Jeanne on November 4, 2013. He testified that he had treated her multiple times since that date and her problem has always been right-sided neck pain. Dr. Hawkins performed a physical exam of Jeanne, which revealed tenderness on palpation of her lower cervical spine, and exquisite tenderness on palpation over

the right lower cervical facets that actually made her pull away. She had no tenderness on palpation over the upper cervical facets on either the right or left side and all of her left-sided facets were normal. She had limited range of motion with flexion and extension secondary to pain and some limited rotation to the right, less to the left. They began with conservative treatment of flector pain patches, then diagnostic cervical facet injections, then steroid injections into the C6-C7 facet joints, and eventually, on December 9, 2013, right-sided multilevel radiofrequency cervical median branch nerve ablation. Dr. Hawkins explained to the jury that radiofrequency utilizes sound waves to create heat in the neck tissue to burn the area around the facet nerve to ablate or stop it from sending pain signals to the brain. Jeanne again had ablation procedures on August 14, 2014; March 5, 2015; and December 28, 2015.[6] Dr. Hawkins submitted a written report in which he states Jeanne's recurrent neck pain is related to the trauma sustained as a result of the rear-end collision, she likely had some pre-existing asymptomatic degenerative disc disease, she probably would not have been seen at the pain center had it not been for the collision, and he believes she will require recurrent care for the remainder of her life.

On April 8, 2014, Dr. Smith wrote the following in his records:

I originally saw her for MVA on November 19th, 2012. She was a seat-belted driver in an S10 who got hit from behind while slowing down by a full-sized truck. Air bag did not deploy. She did not get knocked out. She didn't have any pain at the scene; but over the hours prior to seeing me, she had some stiffness and pain.

She started with conservative measures with ibuprofen and Flexeril, heat and ice. Two weeks later she was still having pain, so

---

[6] Jeanne's insurance covers a portion of the ablation procedure but only if performed every six months.

we got her into physical therapy. This was followed by massage therapy. Unfortunately, she continued to have problems.

She did have an MRI done that did not show any significant acute changes but a lot of chronic changes. She had no pain at all prior to the accident. Saw therapy again.

I last saw her on February 13th, 2014. At that time she was having 1 out of 10 pain, which was new for her since the accident. Despite the MRI findings, she had no pain. She had an occasional flare-up. I told her it will probably be lifelong. She has been doing the home exercises, and again she went through therapy, massage, as well as injections by the pain clinic.

In my opinion, [Jeanne's] neck pain, with a high degree of medical certainty, was a result of the trauma she received in a motor vehicle accident. She is also more likely now, with a high degree of medical certainty, that her treatments as outlined above would not have been necessary but for the injury suffered by her and arriving out of the motor vehicle accident.

In my opinion, it is more likely than not, with a high degree of medical certainty, that she has suffered a permanent injury with the pain now 1 out of 10 from her baseline of no pain. That will also continue to affect her periodically with acute flares for the rest of her life.

During those bouts of acute flares in the future, which are more than likely resulting from her motor vehicle accident, she will require periodic future and medical treatment, physical therapy treatment, and massage therapy or other treatment. I anticipate this could be one to two times a year, lifelong, probably requiring a medical visit, medication, physical therapy, plus or minus injections. Those costs I do not know.

McKinney again treated Jeanne beginning on April 29, 2014. McKinney saw Jeanne about every two weeks, and Jeanne would get some temporary relief—increased range of motion and decreased pain. McKinney believes Jeanne would benefit from treatment every week if she could afford it. McKinney testified more frequent treatment would allow Jeanne to better manage her pain, which would allow her to keep working.

When Dr. Reyerson reopened her practice in September 2015, she again treated Jeanne. Dr. Reyerson testified Jeanne's

condition was fairly similar to when we had quit treating in March of 2014. She was still pretty limited in her activity levels and had, you know, fairly often or fairly consistent exacerbation of symptoms. If she lifted too much, and when I say she's lifting too much or doing too much activity, the things she's doing are not excessive. They're day-to-day activities; for instance, yard work, lifting grandchildren, doing things that all of us want to do so, you know, her condition was pretty similar. The tenderness that she exhibited at the end of our series in March was there at the time in September that I started treating her again.

Dr. Reyerson stated Jeanne continues to have a point of "exquisite tenderness" on her neck—"anywhere from C4 to C7"—she believed to be a nerve injury, and Jeanne will continue to need ongoing treatment.

Jeanne's Exhibit 1 was submitted by agreement on the last day of trial, listing total amounts that had been paid for medical treatment at Allen Hospital ($17,768.72), Cedar Valley Medical Specialists ($6227.37), and Accelerated Rehabilitation ($0.00), as well as itemized medical expenses paid by Jeanne for Dr. Matthew Smith ($903), Dr. John Musgrave ($88), Allen Hospital Massage Therapy ($2422), Jodi Reyerson Physical Therapy ($2070), and Walgreens ($143.81). Total medical expenses paid by Jeanne and her auto and health insurance carriers were $28,832.90, which was the amount requested that the jury award for past medical expenses. She argues that, in light of the evidence, the jury's award of $3000 for past medical expenses bears no reasonable relationship to her losses.

The Chilcotes assert the jury is free to accept or reject any or all of the evidence on the issue of damages or any other issue. The Chilcotes point out their expert witness, Dr. Charles Bain, an accident reconstructionist (board certified in Canada) with training in emergency medicine and engineering,

testified he investigated and reconstructed the collision here. Dr. Bain determined that, at the instant of impact, Carli's vehicle was traveling 2.8 miles per hour faster than Jeanne's, the impact increased Jeanne's vehicle speed "by two and a half miles an hour," and

> [i]n a vehicle like this, you need accelerations of around two and a half or greater G for the head rest to move quickly enough where it's going to contact the head, because the neck hasn't had a chance to drag the head forward. At 1.6 G in this event, this is such a low speed event that the head is not going to lag behind long enough for the head rest to contact it, so the neck can easily generate the forces to pull the head forward. So at this magnitude of acceleration, the head rest is not coming forward quickly enough to contact the back of the head, but it's such a low magnitude event that the head rest doesn't really matter because it's bordering on a trivial event.

Dr. Bain testified studies showed that collisions like the one here do not cause facet-mediated pain. He stated, "You're not going to injure the facet joints in this type of event." Dr. Bain testified further Jeanne "wasn't hurt from the forces that she was subjected to. She may have reflexively startled and tensed up and sustained a mild muscle strain, a reflexive muscle strain. That would be the injuries she sustained from this event." He further opined that mild muscle strain "gets better very, very quickly."

The Chilcotes maintain that, "[a]lthough the opinions regarding the exact speed at the time of impact varies within a narrow range, all parties agree this was a low-speed impact"; Jeanne's experts and the Chilcotes' expert agreed ninety percent of patients involved in such accidents recover in less than six months; and Jeanne's medical records "consistently indicated that she had the most minimal amount of pain that was ratable." They argue the jury could conclude that the minor impact collision resulted in only minor injuries to Jeanne.

The district court ruled:

> The court finds that the jury likely did not find the plaintiff's evidence credible on the issues concerning the extent of damage caused by defendant Carli Chilcote's negligence. The record contained substantial evidence, when viewed as a whole, showing that the collision involved a very low speed impact. The record also contained substantial evidence, when viewed as a whole, to support the award of damages made by the jury. The court finds that the jury's damage award bears a reasonable relationship to the evidence presented. This is especially true in light of the testimony by Dr. Bain, whose testimony if believed by the jury would provide ample support for the verdict that was returned. For instance Dr. Bain's testimony refuted testimony offered by the plaintiff concerning damage to the plaintiff's vehicle. Dr. Bain also testified regarding determination of the relative speed of the vehicles through testing. This testing allowed him to determine the forces on the plaintiff's body resulting from the collision. Dr. Bain's testimony, if found credible by the jury, would support a conclusion that the collision did not cause the extent of damages plaintiff claims, but rather that she sustained a muscle strain of a mild nature. The court does not believe that the jury engaged in mere speculation concerning past medical damages. The court does believe the jury used the evidence, including but not limited to Dr. Bain's testimony, it found most believable in arriving at an approximation of the plaintiff's past medical expenses. Giving the jury the right to accept or reject whatever portions of the testimony and evidence it chose, the court finds that the record as a whole contains substantial evidence supporting a finding that the verdict does substantial justice between the parties. *The court also finds the jury verdict adequately compensates the plaintiff for the damages the jury found were caused by defendant Carli Chilcote's negligence.* Finally, the court does not find any evidence that the jury's verdict was the result of passion or prejudice.

(Emphasis added.)

We have emphasized the court's finding as to the adequacy of the damages because it presumes the jury has found only a portion of the uncontested medical expenses "were caused by defendant." This necessitates a discussion of the jury's instructions as to causation and the scope of Carli's liability for her admittedly negligent conduct.

*B. Jury Instructions.* The district court submitted several instructions concerning the scope of liability. The jury was instructed Jeanne must prove Carli's admitted fault "was a cause of" Jeanne's damages. Instr. No. 10. The jury was also instructed, "The conduct of a party is a cause of damage when the damage would not have happened except for the conduct." Instr. No. 11.

Instruction No. 16[7] (the so-called "eggshell plaintiff" instruction) provided further:

> If Jeanne Elizabeth Grimm had a pre-existing condition which made her more susceptible to injury than a person in normal health, then the defendant is responsible for all injuries and damages which are experienced by plaintiff proximately caused by defendant's actions, even though the injuries claimed produce a greater injury than those which might have been experienced by a normal person under the same circumstances.

And an instruction informed the jury the defendant was liable for damages caused by the aggravation of a pre-existing condition.

Over Jeanne's objection,[8] the court also instructed the jury: "If you find Jeanne Elizabeth Grimm was injured by another act after this incident, she cannot recover for any later injury or aggravation of injury not caused by this incident."

---

[7] This instruction appears to be based on Iowa Uniform Jury Instruction 200.34.

[8] Plaintiff's counsel argued instruction 18 was not warranted:

> [T]here was no evidence in the record that Ms. Grimm had been injured by another act after this motor vehicle collision and it says that if she was injured by another act, she cannot recover from any later injury or aggravation of injury not caused by this incident. And I don't think there's been any testimony of any intervening incident that injured her, no other motor vehicle collision, no slipping on the ice, no falling down the stairs, no doing anything. Now, there's been testimony that her daily living activities at times aggravate her injury that she has, but that's not a separate incident or separate action separate from what flows from the fact that she was injured in the motor vehicle collision.

Jeanne claims there is no evidence she suffered any injuries by another act subsequent to the November 2012 automobile accident. The Chilcotes argue, however, there was evidence presented during the trial that Jeanne reported to her healthcare providers that she had been pain free until she engaged in activities such as shoveling snow, sleeping wrong, or putting on a necklace, at which point her pain levels increased. They also note she reported low back pain on April 29, 2014, which was different from her earlier treatment for neck and shoulder pain. They contend that the jury instruction is warranted under "[a]ny of these [complaints] alone." We disagree.

Instruction 18 is based on Iowa Uniform Jury Instruction 200.33, which is entitled "No Recovery for Second Injury" and provides: "If you find (plaintiff) was injured by another act after this incident, [he] [she] cannot recover for any later [injury] [aggravation of injury] not caused by this incident." The uniform instruction cites as authority *Becker v. D & E Distributing Co.*, 247 N.W.2d 727 (Iowa 1976), and *Waterloo Savings Bank v. Waterloo, Cedar Falls & Northern Railway*, 60 N.W.2d 572 (Iowa 1953).

The *Waterloo Savings Bank* case involved a plaintiff who suffered a hip fracture from a fall on a city bus and later experienced an aggravation of a pre-existing symptomatic serious heart and lung condition. 60 N.W.2d at 574. In that case, the court stated:

> Defendant's liability is limited to compensation for injuries caused by its own acts of negligence, and not for injury, suffering, or impaired health due to other causes. *Clark v. Sioux Cnty.*, 159 N.W. 664[, 666 (Iowa 1916)]. How much of plaintiff's trouble after the accident was due to her previous ill health, how much to her fall in the bus, was for the jury to say.

The facts show plaintiff was in a state of dangerous shock for some time after the accident, and of severe shock perhaps for a week. She suffered a linear fracture of the hip. She was confined to the hospital for seventy-two days. She had bruises on her ribs and complained of considerable pain in her neck. Her heart and lung trouble was aggravated, temporarily at least, by the accident.

*Id.* at 578-79.

*Becker* involved a plaintiff injured in 1969 in a two-vehicle collision who later, in 1973, had a second injury when he dropped a sixty-pound weight on his left foot. 247 N.W.2d at 728. The *Becker* court concluded:

Finally, we consider the effect of Becker's subsequent foot injury in 1973. The general rule holds a defendant cannot be held liable for injuries sustained after his negligence. . . . Exceptions arise in the case of independently acting tort-feasors joined as defendant where damages cannot be apportioned, . . . and where the subsequent injury-producing act is a sequela of the first, *Cross v. Hermanson Bros.*, 16 N.W.2d 616, 617 (Iowa 1944); *see Cardamon v. Iowa Lutheran Hosp.*, 128 N.W.2d 226, 233-34 (Iowa 1964); *Phillips v. Werndorff*, 243 N.W. 525, 526 (Iowa 1932); 22 Am. Jur. 2d *Damages* § 115, at 167-68; Annot., *Proximate Cause: Liability of Tortfeasor for Injured Person's Subsequent Injury or Reinjury*, 31 A.L.R.3d 1000 (1970).

If the evidence were uncontroverted that Becker's present foot condition resulted in whole or in part from the 1973 incident, the general rule and none of the exceptions would apply because Becker's subsequent act in dropping a weight on his foot clearly would have no causal connection with the alleged negligence of defendants.

But here, as we have already indicated, the evidence was not uncontroverted. Dr. Marr twice denied the weight-dropping accident had any connection with Becker's present foot condition. Following the authorities set out above and leaving for the jury the weight and credibility of the testimony, including contradictions and inconsistencies in the testimony of a particular witness, we hold the issue was properly submitted. Under the instructions submitted the jury could have found the 1973 injury had no relationship to Becker's present complaints.

*Id.* at 731-32.

This court upheld the use of an instruction based on uniform instruction 200.33 in one instance. *Bruns v. Hanson*, No. 06-1553, 2008 WL 680228, at *3-4 (Iowa Ct. App. Mar. 14, 2008). But we did so—without discussion—based on the trial court's finding and the parties' concession there existed an intervening cause.[9] *Id.* at *4 (noting "because there is evidence that there has been *medical treatment for something else, unrelated to the accident and it's conceded*, I think they need to know that that's what the law is" (emphasis added)).

In the case before us, we must address whether there is sufficient evidence of a subsequent act causing additional or different injury to warrant the instruction. Because the instruction provides a means to limit the defendants' liability, they had the burden to present sufficient evidence to support the instruction. *See Graber v. City of Ankeny*, 616 N.W.2d 633, 642 (Iowa 2000) ("[T]he burden of proof on an issue is upon the party who would suffer loss if the issue were not established." (quoting *Beyer v. Todd*, 601 N.W.2d 35, 41 (Iowa 1999))).

---

[9] As explained in the Restatement (Third) of Torts: Physical and Emotional Harm § 34, comment b:

> The terminology used by the first and Second Restatements of Torts and courts includes "intervening forces (or acts)," which consist of acts, omissions, or other forces that occur after the tortious conduct of the actor and that are other than the background causes that ordinarily exist. A "superseding cause" is an intervening force or act that is deemed sufficient to prevent liability for an actor whose tortious conduct was a factual cause of harm. The "act" may be tortious or entirely innocent. This terminology has been widely adopted, although a number of courts employ the term "supervening" cause instead of "superseding" cause.
>
> These terms are only conclusory labels. A reasoning and normative process is required in order to separate background causes from intervening forces and to decide which intervening forces under what circumstances are superseding, thus avoiding the liability of an actor who engaged in tortious conduct.

The defendants point to Jeanne's "report[] to her health care providers that she had been pain free until she did various activities such as shoveling snow, sleeping wrong, or putting on a necklace." While there are notations in Jeanne's medical records of increased pain after activities, there is nothing in this record of a second incident or subsequent act that would warrant instruction 18.

In *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 15 (Iowa 1977), our supreme court explained:

> A superseding cause "is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) Torts § 440; *see Schnebly v. Baker*, 217 N.W.2d 708[, 729] (Iowa 1974). In order for an intervening act or force to relieve an individual from liability*, it must not have been a normal consequence of his acts or have been reasonably foreseeable. . . .*
> 	. . . .
> We think Mrs. Woodford's inaction cannot be considered superseding as a matter of law. The following statement is applicable from *Fredericks v. American Export Lines, Inc.*, 227 F.2d 450, 453 (2nd Cir. 1955):
> > That the intervening purchaser will remain passive or otherwise fail to do what he ought to do to prevent the course of events, is a reasonably foreseeable consequence of the original wrongdoing. Moreover, this is not a distinction based upon mere passivity but rather upon whether or not the ultimate fact or occurrence is reasonably foreseeable. This is a far cry from the doing of something or the refraining from doing something constituting an improbable, independent, intervening cause, which is a superseding cause and breaks the sequence.
> *See also* Restatement (Second) Torts, §§ 393, 396; Prosser, *Law of Torts*, § 102 at 670 (4th ed.). Under particular facts, intervening conduct may be so manifestly superseding in nature as to cut off liability for a defendant's prior actions as a matter of law. But when facts are in dispute or room exists for reasonable difference of opinion as to whether the conduct is intervening, the question is for the jury.

(Emphasis added.)  *See also Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 349–50 (Iowa 1991) (stating "the actor may be relieved of liability if a court finds that the later-occurring event is such as to break the chain of causal events between the actor's negligence and the plaintiff's injury"), *abrogated on other grounds by Thompson v. Kaczinski*, 774 N.W.2d 829 (Iowa 2009).

In *Thompson*, our supreme court adopted section 7 of the Restatement (Third) of Torts: Liability for Physical Harm.  774 N.W.2d at 839 (then a tentative draft, officially adopted 2010)  [hereinafter Restatement (Third)].  And in *Mitchell v. Cedar Rapids Community School District*, 832 N.W.2d 689, 699 (Iowa 2013), the court discussed the "scope-of-liability analytical framework" of sections 29, 30,  and 34 of the Restatement (Third).

Comment "g" of section 29 of the Restatement (Third) states:

> The first and Second Restatements of Torts were influenced by causal thinking that has long been repudiated.  This Restatement, by contrast, treats factual cause and scope of liability separately for several reasons.  The most important is that decoupling the two concepts permits the court and factfinder to focus on the issue that is truly in dispute without having to invoke a doctrine that is not in dispute.  Even when both issues are in dispute, clearly differentiating the predominantly historical question of factual cause from the evaluative question of scope of liability makes for a clearer, more focused analysis.  Finally, separation enables courts to employ instructions that avoid causal language when explaining scope-of-liability limitations to the jury.
>
> Thus, common instructions on proximate cause that employ language requiring that the tortious conduct cause the harm in a "natural and continuous sequence," sometimes accompanied with the additional requirement that the causal sequence "be unbroken by any efficient intervening cause," do not reflect the risk standard adopted in this Section.  Nor do these instructions reflect the limitations on scope of liability, provided in § 34, when there are intervening causes.  Comment *d* contains an explanation of the scope of liability adopted in this Section, as well as language from which appropriate jury instructions might be crafted that reflect the risk standard.

Section 34 of the Restatement provides: "When a force of nature or an independent act is also a factual cause of harm, an actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." Commentary explains the development of tort jurisprudence:

> The extensive rules for when intervening acts become sufficient to "supersede" an actor's earlier tortious conduct were developed at a time when the prevailing jurisprudence was that law was scientifically based and correct legal principles could be deduced through logical and objective inquiry. Consistent with this philosophy, *the* "proximate cause" of any event could be determined through a neutral, scientific inquiry. Rules regarding which intervening acts prevented prior acts from being the cause of subsequent harm were integral to this inquiry. Although criticism of this legal scientism had begun before the first two volumes of the Restatement of Torts were completed in 1934, the Restatement reflected this jurisprudential view. It treated factual cause and limits on the scope of liability as a single inquiry and contained extensive provisions regarding which intervening acts could and could not be superseding causes. *See* Restatement of Torts §§ 439-452. The first Restatement's treatment of intervening and superseding causes was carried forward with but very modest changes in the Restatement Second of Torts. Despite the continuing influence of the Second Restatement of Torts, much of the formalism of its treatment of superseding causes has been supplanted in the latter part of the 20th century with a recognition that there are always multiple causes of an outcome and that the existence of intervening causes does not ordinarily elide a prior actor's liability. The advent of more refined tools for apportionment of liability—comparative responsibility, comparative contribution, and substantial modification of joint and several liability—also has undermined one important rationale for these rules: the use of scope of liability to prevent a modestly negligent tortfeasor from being held liable for the entirety of another's harm when the tortious acts of other, more culpable persons were also a cause of the harm.

Restatement (Third) § 34 cmt. a.

> But employing superseding cause to bar a plaintiff's recovery based on the plaintiff's conduct is difficult to reconcile with modern notions of comparative responsibility. Indeed, in most cases it constitutes negating the principles of comparative responsibility and returning to a regime of contributory negligence as a complete bar

to recovery. There may be instances in which the plaintiff's intervening conduct produces harm that is different from the harms whose risks made the defendant's conduct tortious, but those cases are sufficiently infrequent that courts should be very cautious about invoking superseding cause based on a plaintiff's act to hold the harm outside the defendant's scope of liability.

*Id.* § 34 cmt. c.

We believe these comments suggest instruction 200.33 should be used only when there is evidence of a subsequent and independent act causing injury unrelated to any weakened condition caused by the first injury. Here, we agree with Jeanne there is no evidence Jeanne's ongoing treatments and damages were caused by "another act after this incident." Rather, Jeanne's harm remained within Carli's scope of liability.

In sum, the only disputed issues presented to the jury were the extent of Jeanne's injuries caused by Carli's negligence and the amount of damages. Instruction 18 permitted the jury to cut off Jeanne's damages on the basis of acts both insubstantial and non-superseding in nature. We acknowledge the low-impact crash, but in light of the extensive evidence of Jeanne's injury, medical procedures, medical expenses, and permanent-injury diagnosis, we cannot be convinced that substantial justice has been accomplished. To conclude there was no prejudice[10] would be sheer speculation on our part. The trial court erred in giving instruction 18. We reverse and remand for a new trial.

**REVERSED AND REMANDED FOR NEW TRIAL.**

---

[10] *See Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) (noting an error in giving an instruction merits reversal if it results in prejudice).